# 𝔚𝔶𝔱𝔥𝔢𝔳𝔦𝔩𝔩𝔢.

SAUNDERS AND WIFE V. GREEVER, ADM'R, &C.

August 16th, 1888.

1. PERSONAL PROPERTY—*Possession—Ownership.*—As men generally own the personal property they possess, so proof of possession is presumptive proof of ownership.

2. PARENT AND CHILD — *Contracts — Equity — Proof.*— Contracts between parent and child are in equity regarded with a jealous eye. Hence, when the *bona fides* of the transaction is in question, the proof must be clear, cogent and convincing. *Poorman* v. *Kilgore*, 26 Penn. St. 365 ; [67 Am. Dec. 425.]

3. IDEM—*Listing personalty for taxation—Case at bar.*—Father owned and occupied farm, and possessed valuable utensils, stock, furniture, etc. Son lived with him as manager. For nine years before father's death, personalty was listed in son's name, and after father's death son claimed it as his under parol purchase. Evidence to establish purchase was deficient, and showed that personalty was so listed to avoid execution-levy for surety debts, and that father claimed and exercised ownership over it up to his death. In suit between son and his co-distributees :

HELD :

> The presumption of ownership in son, arising from listing the personalty in his name, was overcome by other evidence, and the property is a part of ancestor's estate for equal distribution.

4. WITNESSES—*Competency.*—When one distributee claims as his own personalty in possession of ancestor at his death, under parol purchase by distributee from ancestor, said distributee is not, in a suit with his co-distributees, competent to testify to said purchase, unless his case comes within some one of the conditions contained in Code 1873, ch. 177, §§ 21 and 22, as amended by Acts 1876-'7, ch. 256, p. 265.

Appeal from decree of circuit court of Smyth county, rendered July, 1886, in the cause of J. W. S. Saunders and Rachel V., his wife, and John E. Perkins and Sarah R., his wife, against

James S. Greever, administrator in his own right and as administrator of Hiram A. Greever, deceased.

The facts are these: Hiram A. Greever, a prominent citizen of Smyth county, departed this life at his residence in said county on the 23d day of May, 1882, intestate, leaving three children, to-wit: said female complainants and one son, said defendant, James S. Greever, all of whom were adults and all married. These three children were the sole distributees and heirs at law of the intestate, who had lost his wife some years before his death. The daughters, with their respective husbands, resided one in Smyth county and the other in the adjoining county of Wythe, and they frequently visited their father after their marriage. The said James S. Greever, an only son, with the exception of a few years, lived with his father until the death of the latter, and, with his family, yet lives in the old family mansion where his father died.

The intestate, Hiram A. Greever, died seized and possessed of a large and very valuable estate, real and personal. The real estate consisted of two tracts of land—one situated in Smyth and Washington counties, containing some three hundred and sixty-five acres, on which he resided, and the other in Smyth county containing some one hundred and sixty acres. These lands, especially the home place, were very valuable, and were in a high state of cultivation.

The personal property consisted in the main of numerous and valuable horses, cattle, sheep, hogs, bacon, grain, hay and oats, with household furniture and wagons, carts, harness, and numerous implements of husbandry. The debts of the intestate, who was a thoroughly practical and prosperous farmer and grazier and business man, were few, and amounted to a very small sum. The personal property referred to was on the premises of the intestate at his death, and, to all appearances, in his exclusive possession, control and ownership. The defendant, James S. Greever, owned and had on the place at his father's death two horses, a cart, saddle and bridle, a buggy and harness,

and some chamber furniture, as to which there is no dispute. The controversy is as to the ownership of the major part of the personal property, other than that above referred to as owned by James S. Greever. The property in controversy is estimated by the plaintiffs at some $3,000, while by the defendant it is estimated at some $1,500. The plaintiffs claimed that the property in dispute was the property of their father; that it belongs to his estate, and that they are entitled to share in the distribution thereof. But the defendant, James S. Greever, denies that the property in dispute belonged to the intestate, or is part of his estate and subject to distribution, and he claims it in his own right.

In addition to the property already referred to, there was on the premises a lot of stock-cattle owned by the intestate and James S. Greever in partnership. Very soon after intestate's death the distributees, all of whom were adults, met together and talked over the matters touching their father's estate, and agreed to divide the personal estate among themselves; but as it was then in the midst of the farming season, they also agreed to postpone the division until the crops were secured; and that in the meantime James S. Greever should take charge of the lands and personal property, and conduct the farming operations until the crops were secured. Accordingly, on the 27th of May, 1882, only four [days after intestate's death, they entered into the following agreement in writing:

"Article of agreement, made and entered into this 27th day of May, 1882, by and between James S. Greever, of the one part, and John E. Perkins and Sarah Rebecca, his wife, late Sarah Rebecca Greever, and J. W. S. Saunders and Rachel Virginia, his wife, formerly Rachel Virginia Greever, of the second part; witnesseth, that by the death of Hiram A. Greever, the said James S. Greever, Sarah Rebecca Perkins and Rachel Virginia Saunders have become the joint owners of all the real and personal property which belonged to said Hiram A. Greever, and the property is of such a character and in such a condition

that it would be prejudicial to the interests of all the parties to make division of the same now, and, that being the case, it is agreed by and between all the aforesaid parties that James S. Greever shall have, during the present year, the entire management and control of all this property as he has had control of it heretofore; to manage and attend to as he may deem best for the joint interest of himself and his two sisters aforementioned, and with full authority for the purpose to make any sales or purchases of personal property that he may deem advisable and that he may think will promote the joint interest of all parties; and at the end of the year he will make report of what he has done and of the then condition of the joint property belonging to himself and his sisters to the said parties.   And as this management and agreement necessitates the withdrawal of the attention of the said James S. Greever from any other business, and the devotion of his entire time to the management of this property, it is agreed by and between the parties aforesaid that such compensation shall be paid out of the joint property to the said Greever, for his services above mentioned, as John M. Preston, C. W. Beatie and James D. Hutton shall say he is entitled to. If necessary, the said James S. Greever may continue in the management of this property for a time longer than one year, and if he does he shall continue that management upon the same terms as that set forth above.   Witness the following signatures and seals the day and date above.

> JAMES S. GREEVER    [SEAL.]
> JNO. E. PERKINS    [SEAL.]
> J. W. S. SAUNDERS    [SEAL.]
> R. V. SAUNDERS    [SEAL.]
> S. R. PERKINS    [SEAL.]

Afterwards, to-wit: at the July term, 1882, of the county court of Smyth county, James S. Greever, without consultation with, and without the knowledge of the other distributees, qualified as the administrator of his father's estate and entered into

bond as such in the penalty of $2,400, with one surety, a resident of Washington county. He had no appraisers appointed.

At the August term, 1882, of said court, on the motion of the other distributees, appraisers were appointed, and they afterwards appraised the personal property belonging to the intestate's estate, as shown to them by James S. Greever. Afterwards, on the 17th day of January, 1883, the property appraised, together with a few unimportant items overlooked by James S. Greever at the time of the appraisement, was sold, the gross proceeds amounting to $1,121.27. The following is the list of the property sold:

| | |
|---|---:|
| Half interest in an undivided lot of 21 yearlings, cattle bought by Jas. S. Greever, | $ 310 00 |
| 1 bay horse, 25 years old, no bid made, | 00 00 |
| 1 field of corn-fodder (74 shocks)—James S. Greever, | 20 00 |
| 3 stacks of old clover hay—Joseph Hutton, | 22 00 |
| 1 stack of timothy hay—Jas. S. Greever, | 17 00 |
| 1   "   "   —Joseph Hutton, | 15 25 |
| 1   "   "   " | 15 25 |
| 1   "   "   " | 10 00 |
| 1   "   "   —Jas. S. Greever, | 10 00 |
| 2   "   "   " | 27 00 |
| 1   "   "   " | 14 75 |
| 1   "   "   —Jas. L. Vance, | 9 00 |
| 1   "   "   " | 15 25 |
| 1   "   "   —Jas. S. Greever, | 7 25 |
| 1 crib of corn, measuring 340 bushels, at 56c.—Jas. S. Greever, | 190 40 |
| 1 pen of corn, measuring 263½ bushels, at 58c.—Jas. S. Greever, | 152 83 |
| 32 bus. corn, at 60c.—Jas. L. Vance, | 19 20 |
| 7½ bus. wheat, at $1.00—Jas. S. Greever, | 7 50 |
| 194½ bus. wheat, at 70c.,   " | 136 15 |
| 41   "   "   at 55c.,   " | 22 55 |

Statement.

| | | | | | | |
|---|---|---|---|---|---|---|
| 17 bus. oats, at 41c.—Jas. S. Greever, | - | - | $ | 6 | 97 |
| 80 gallons of cider, " | - | - | | 5 | 00 |
| Cabbages, " | - | - | | 3 | 00 |
| 1 hole of potatoes—N. C. St. John, | - | - | | 3 | 00 |
| Potatoes in cellar—Jas. S. Greever, | - | - | | 3 | 00 |
| 90 lbs. nails, " | - | - | | 3 | 50 |
| 80 lbs. coffee, " | - | - | | 11 | 50 |
| 50 lbs. sugar, " | - | - | | 6 | 00 |
| 1 mowing machine—Joseph Hutton, | - | - | | 53 | 00 |
| 2½ bushels of beans, at 50c.—Jas. S. Greever, | - | | 1 | 25 |
| 3 " onions, at 58½c., " | - | - | | 1 | 75 |
| 12 brooms, at 16c., " | - | - | | 1 | 92 |

$1,121 27

With their bill the complainants file a schedule " A," as containing a list of the property in dispute, which was claimed by James S. Greever and was not appraised and sold. It is as follows:

"1st. Six work horses, two of which have been sold to Stephen Saunders, the riding horse of H. A. Greever, two old horses, one three year old filly, 1 yearling colt, and 2 sucking colts and probably others.

" 2d. 9 milch cows, including the heifers to have calves, together with a calf from each, one bull since sold to Jno. M. Preston, one bull still on the farm.

" 3d. 36 sheep and wool off same.

" 4th. 31 hogs fattened and afterwards killed by James S. Greever, some stock hogs consisting of two or three sows, 1 boar and 15 or 20 shoats.

" 5th. Farming implements, consisting of three wagons— two two-horse wagons, 1 four-horse wagon—and both two and four-horse wagon harness and separate harness for plowing, two two-horse Oliver chilled plows and two other two-horse plows, 3 single and 3 double one-horse plows, 2 harrows,

2 cutting knives and boxes, 5 cradles, 3 mowing scythes, 6 pitchforks, rakes, hoes, shovels, picks, double-trees, single-trees, stretchers, log-chain, fifth-chain, etc.

"6th. 1 wind-mill, 1 cider-mill, 1 seed-sower, 1 lot of black-smith tools, a large lot of barrels, hogsheads, tubs, etc., half-bushel sacks, etc., 3 side saddles, two of which were given by H. A. Greever to Mrs. Saunders and Mrs. Perkins, the saddle used by H. A. Greever himself, 6 riding bridles, a large lot of books, a lot of flax, a lot of hay and oats in stable, 1 straw-rick, 1 corn-sheller, household and kitchen furniture, 8 feather-beds including steads, 1 parlor carpet, 2 other carpets, 3 cherry tables, 2 candle-stands, 2 large mirrors, 1 bureau, 2 cupboards, 1 cook stove, 5 dining and kitchen tables, 2 sets of china, 1 full set of common dishes, 2 small tables, 6 lard cans, 5 large wheels, 2 small wheels, 1 loom, 1 clock, several pictures, 1 piano, stool and cover and box for same, 1 silver castor, 12 large silver spoons, 6 dessert spoons, 10 small silver teaspoons, 1 large sil-ver ladle, 1 pair silver tongs, bed clothing for all the beds, and extra quilts, counterpanes, comforts, table-linen, towels, sheets, etc."

After setting forth substantially what is above stated, the complainants, in their bill, allege that in the conversation or conference had by them and James S. Greever after the intes-tate's death, and preceding the written agreement of May 27th, 1882, touching the management and division of their father's personal estate, nothing was said about reducing the agreement then arrived at to writing, nor anything about administering on the estate, but that complainant, Mrs. Perkins, did say that the property ought to be appraised, and that each of distribu-tees should have a copy of the appraisement, but that James S. Greever objected to this, saying that she doubted his honesty, which she disclaimed, yet insisting that appraisers ought to be appointed; but that James S. Greever persisted in his objec-tion, saying that they could divide it without appraisers. That soon after this the agreement of May 27th, 1882, was signed;

that at the June or. July term of Smyth county court, James S. Greever, without consultation with plaintiffs, and without their knowledge or consent, caused himself to be appointed administrator of intestate's estate; that plaintiffs knew nothing of the amount of personal property given in by him, or of the penalty of his bond; that they afterwards learned that he valued the personal property at $1,200, and gave bond in the penalty of $2,400, with Joseph Hutton, of Washington county, as his sole surety.

They further allege that they are informed as to the value of the personal property which their father owned and possessed at the time of his death; that they possess this information as sensible children, of mature years, raised on the farm where the property was, and that, though it was not just then their place of residence, they always had the fullest access to it and their father's house, where they often went and were always welcome. That they further know that intestate spoke of, controlled and disposed of the property as had always been his custom, and is the custom of all other farmers in dealing with their own. That they further know that James S. Greever always, so far as they know or believe, recognized it as intestate's property, and that he never questioned intestate's ownership and possession, nor asserted nor attempted to assert any ownership in himself, except as to that which was confessedly his as before stated. That James S. Greever lived with his father as a child and as a member of his family; that he owned two horses, a cart, a saddle and bridle, a buggy and harness, and some chamber furniture; but that, as to the property embraced in schedule "A," it was the property of the intestate, about which there was no dispute, no doubt; and that this was part of the property which the three children, on the occasion referred to, spoke of dividing between them, and which Mrs. Perkins insisted should be, and which James S. Greever objected to having appraised, so far as they can recollect it.

And they further allege and charge that James S. Greever did

not give in, nor intend to give in, all the personalty belonging to intestate's estate, and they say they base their conclusion upon his estimate of the value of the property, as evinced by the small penalty of his bond as administrator; upon the fact that he objected to having the property appraised, and had no appraisers appointed; upon the fact that he procured his appointment as administrator without their knowledge or consent, and failed to inform them of his appointment after it was made; and upon the fact that when they afterwards had appraisers appointed, he took offence at their action, failed to show the appraisers all the personal property, and, as they understand, pretends that the property not shown and not appraised belongs, not to the intestate's estate, but to him.

And they further charge that the intestate claimed, owned, used and controlled all the personal property on his lands, except as before specified; that as to the partnership cattle before referred to, Hiram A. Greever and James S. Greever were equally interested, except that the former, in consideration of the wintering and pasturage he could furnish at his home, was not to pay for the pasturage rented for them. And further, that before his death the intestate and his son, James S. Greever, made a settlement of all unsettled matters between them, as shown by intestate's books in the possession of said James S. Greever; that intestate's habit was to keep accounts covering all of his transactions of importance; that he charged himself with the debts he owed and credited himself with what he paid, his intention being that his own books should show his condition, a fact, they say, which was well known to James S. Greever, who, since his father's death, has said that his father's "books showed exactly every single transaction"; and that said James S. Greever has possession of those books, and plaintiffs are willing to settle by them.

And in the bill it is also said, "Plaintiffs are further informed that said James S. Greever alleges and pretends that he holds tax-tickets for said personal property. That may be true, but

plaintiffs do not understand him to claim that he paid them with his own means. On the contrary, they charge, and call upon him to answer, that intestate in every instance furnished the money"; that James S. Greever did not claim said property, except his share of it as one of the three heirs of intestate, but on the contrary, spoke of it as the property of the estate in which they were equally interested, until after the contract with him to manage the farm was signed, and until he had qualified as administrator.

And the plaintiffs further charge that it was because of their understanding that it was accepted as a fact on all hands that the three were joint and equal owners of the property, that they ever consented that James S. Greever should take control of it; and that he did take control of it as joint property, in which he had a share equal to one-third of it, after paying the small indebtedness of intestate.

The bill concludes as follows: "Plaintiffs had well hoped that intestate's estate could and would be settled by the parties themselves, or, failing in that, that they could have agreed upon competent, disinterested parties to settle and adjust matters between them; and to this end they, through their counsel, submitted a proposition of settlement by such parties, but before negotiations were concluded or broken off they, your orator and oratrix, Saunders and wife, were served with process to answer James S. Greever's bill, exhibited to your honor, of and concerning the land herein mentioned, and hence they brought this suit. And being remediless according to the strict rules of the common law, and relievable only in equity, where matters of this sort are properly cognizable and relievable, their prayer is that James S. Greever shall be made a party defendant hereto, in his own right and as administrator of Hiram A. Greever, deceased, and that he, full, true, direct and perfect answer make to all and singular the allegations hereof as if they were here repeated, and he separately interrogated thereto; that he make and file with his answer a full and true inventory of all the personal

property on the lands of Hiram A. Greever at his death, except the horses, colt, buggy and harness, saddle and bridle, and household furniture hereinbefore mentioned as the property of said defendant, and except the gold and silver coin of said intestate, which was equally divided by and between the three children; and that he exhibit with his answer the account between himself and his intestate, as shown by said intestate's books of account; and that he deliver said books into the custody of the clerk of your court so that the plaintiffs may have necessary access to them; and that all matters of difference between them may be fully and finally settled; and that plaintiffs may have such further and general relief as to equity belongs and to your honor seems meet."

The defendant, James S. Greever, demurred to and answered the bill. He admits, in his answer, that his father, Hiram A. Greever, died possessed of a valuable real and personal estate, and that his wife predeceased him, leaving him and his two sisters the sole heirs and distributees; that intestate died seized of two tracts of land, and was but little indebted; states that intestate was, when able to attend to it, a good farmer, perhaps as good as any in the county, but that he was for several years before his death in such health that he was not able to give any attention of consequence to the farm, during all of which time the whole burden of the farming operations devolved upon respondent, who lived with his father. That he frequently consulted his father as to the farming operations, but that was about all the attention given by the intestate to such operations for many years prior to his death; that he died seized of the personal property which was appraised; that respondent is now in his forty-sixth year and has, ever since he was twenty-one, worked with and for his father on his farm, except, perhaps, some ten or twelve years, during which he was otherwise occupied and away from home; that for the last thirteen years prior to his death, with the exception of the winter months for a part of that time, when respondent was in the legislature, the intes-

tate and respondent were engaged in farming and cattle-raising together; that during some part of that time respondent was the county surveyor of Smyth county, but that this did not, on an average, occupy more than two months of the year, the residue of the time being devoted to the farm, so, he says, that in truth it may be said that, ever since the war, the principal management of intestate's farm has devolved upon respondent, and it would, therefore, be somewhat singular if respondent, who has always been a prudent and economical man, should, at the death of his father, only own two horses, a colt, saddle and bridle, and some chamber furniture.    That in the state of affairs existing at his father's death, respondent did say to his sisters that he thought it best that the farming operations should be continued during the year, as the crops had then been pitched, and contracts made which could only be properly carried out in that way; that this was agreed to by all parties; that respondent then suggested to the parties that they had better go to Mr. Gilmore, who was their father's personal friend and had always been his attorney, and have an agreement to this effect drawn up, which was also agreed to; that the husbands of the female complainants and respondent then went to Marion, saw Mr. Gilmore, and he drew for them the agreement of May 27th, 1882, which was afterwards signed by all the parties; that after this arrangement was made, respondent proposed to settle the estate up as the administrator, and that this was also agreed to by them; and, in accordance with that agreement, respondent did qualify as the administrator of his father's estate at the July term, 1882, of the Smyth county court; that nothing was said, that respondent recollects, about any appraisement of property, and that respondent certainly never objected to any appraisement of it.

And respondent further says, that after his qualification as administrator, his attorney, James H. Gilmore, knowing of the arrangement as to the management of the farm, thought there was no necessity then for having appraisers appointed, as noth-

ing was then to be sold at public auction, and as, under the con
tract aforesaid, the character of the property might be changed
before the end of the year, and so appraisers were not appointed;
and, respondent says, that it was furthest from his thoughts to
suppose that there would be any objection to this on the part of
any one, and that he was surprised when, at the August county
court of Smyth, 1882, complainants had appraisers appointed;
that after they had been appointed he submitted to it and
showed them for appraisement all the property which belonged
to intestate's estate; that he has always been, and is now, will-
ing to divide equally and fairly, between himself and sisters,
every particle of personal property which belongs to the estate
of the intestate. But he denies emphatically that any of the
property mentioned in schedule " A," with the bill, is the prop-
erty of the estate of Hiram A. Greever, or that he at any time
conceded that it was other than his own property. And he
alleges that all the property which belonged to the estate of
said intestate was shown to the appraisers, all of which was
appraised by them except two bushels and a half of dried beans,
three bushels of onions and twelve brooms, which were over-
looked by the appraisers, but which were afterwards sold by
respondent, as administrator, at the sale. And respondent
denies that the property now claimed by the complainants is
the property of Hiram A. Greever, and insists that it is his
property, and denies that he ever, in any way, admitted that his
sisters were entitled to any portion of it. He denies that in-
testate before his death claimed any of this property as his own.
But, on the contrary, says that it was listed for years before the
death of intestate as the property of respondent, as the assessor's
books will show, and that Hiram A. Greever gave in his own
property ; that the tax-tickets against intestate and against
respondent were made off separately, and that respondent paid
his own taxes with his own money, and says that these tax-
tickets can be produced whenever necessary.

He further says that, as to the cattle mentioned, there was

never any dispute about them ; that there were some twenty-six of these, and the contract as to them was as follows : " Your respondent was to furnish the cattle, and they were to be kept upon the place if they could be kept there; if pasture had to be hired, each party paid one half of this, and when the cattle were sold the profits, less what was paid on said pasture, and cost of purchase, was to be equally divided between respondent and his father"; that respondent always admitted this, and never claimed any other interest out of the sales of these cattle ; that this cattle contract was fully explained in the report made by respondent to complainants, as before mentioned ; and that the contract with regard to the cattle sold at the sale was exactly the same.

Respondent admits that he and his father had a settlement of all unsettled matters between them, except what pertained to these cattle transactions, a short time before his death.   He admits that it was his father's habit to put down upon his books most of his transactions, charging himself with the debts that he owed and crediting himself with what he paid, but, he says, there are many transactions of importance that, to the knowledge of respondent, do not appear upon his books.   He denies ever saying that his father's books " showed exactly every transaction," for, he says, he knew that they did not, and that he can, if necessary, refer to several instances of important transactions which his father had that are not in his books at all.

Then, after a long rehearsal of the circumstances leading up to the suit brought by respondent for a partition of the real estate, and the bringing of this suit by the complainants, which is immaterial to the questions to be here decided, the respondent in his answer repeats that the appraisement and sale-bill (copies of which are exhibited with the answer) show all the personal property of which Hiram A. Greever died seized ; and he avers that he has never at any time refused the complainants access to the intestate's books, but, on the contrary, whenever asked, he has cheerfully furnished them the books ; that he has

taken special care of these books, as he has frequent occasion to refer to them on matters of business touching the estate, and will deliver them to the clerk or whomsoever the court may direct them to be handed to, but asks that the court will permit them to be as convenient of access to him as may be. And in conclusion he suggests that as complainants can take from the books respondent's account, that they will not require him to perform the labor of making a copy, as he prefers that another should copy the account from the books themselves.

To this answer the complainants excepted as follows:

1st. " Because the defendant does not set forth any contract as the contract which he alleges and pretends was made by and between him and his intestate, failing to give either time or terms of said contract."

2d. " Because the defendant fails to answer whether the personal property was reduced to possession by him or was not in the possession of his intestate."

3d. " Because the answer is not a full and complete answer, but is indefinite, vague and evasive."

On the 30th of April, 1883, the cause was heard on the defendant's demurrer to the plaintiffs' bill, and on the said plaintiffs' exceptions to the defendant's answer, when a decree was rendered overruling said demurrer and overruling the plaintiff's exception No. 3 to said answer, but sustaining the plaintiff's exceptions 1 and 2 to said answer, and requiring the defendant to answer by amendment more specifically as to the date and terms of the contract of partnership in the bill and answer mentioned, and what was done under said contract, and also as to the allegations in the bill of possession and control of the property in question by the defendant's intestate in his lifetime, and remanding the cause to rules for that purpose.

The defendant filed his amended answer, the body of which is as follows:

" Your respondent answering further by way of amendment, as required by said decree, answers and says: That the contract

between himself and his father, of partnership with regard to certain cattle mentioned in his answer, was made some nine or ten years before his father's death, and continued from that time until his death, and the cattle mentioned in his answer were the property of that partnership. The terms of contract were as set forth in his answer. Your respondent was to furnish the cattle, they were to be kept on the place " (intestate's place) "if they could be kept there; if pasture had to be hired, each party paid one-half of this, and when the cattle were sold the profits, less what was paid for outside pasture and cost of purchase, was to be equally divided between respondent and his father."

Your respondent would also state further, with regard to the possession of the property now claimed by complainants in schedule "A," that this property has been in his possession, such of it as was in existence at the time, ever since the year 1873. Some of it is the increase of the property purchased in that year, and it all has been in his possession and was so in his possession at his father's death, and was so listed and taxed with the knowledge of intestate, and respondent's father never exercised any control or authority over it except by the consent and approval of respondent.

The plaintiffs filed exceptions to the answer as amended, but the court overruled the exceptions, and thereupon the plaintiffs replied generally to the answer as amended, and the cause was continued.

The depositions of a very large number of witnesses were taken, and the cause having been regularly matured, came on to be heard on the 19th of July, 1886, at a special term of said circuit court, when the following decree was rendered :

" This cause came on this day to be heard upon the bill and answer and exhibits filed therewith, and the depositions of witnesses and exhibits filed in the cause, and was argued by counsel ; upon consideration whereof, and for reasons stated in writing and filed in the papers of the cause, the court doth adjudge,

order and decree that plaintiffs are not entitled to the relief prayed for in their bill so far as it relates to the property set forth in exhibit marked schedule 'A,' the court being of opinion, and so decreeing, that the sales of property made by Colonel Greever to James S. Greever in the year 1873, were valid and binding, and that said property belongs exclusively to defendant, James S. Greever; but it being suggested that there was some bacon on the Greever premises at the death of Colonel Greever which had not been disposed of at the end of the current year succeeding his death, under the farming contract, as extended by the agreement entered into 27th of May, 1882, between James S. Greever and his sisters and their husbands, and it also not appearing that a settlement has been made between the parties under said contract of May 27th, 1882, it is further ordered and decreed, in order to settle all matters between the parties, that Wm. C. Sexton, one of the commissioners of this court, shall proceed, after giving due notice to the parties, to ascertain the quantity of bacon which was on hand on the Greever place at the death of Colonel Greever, and which had not been disposed of under the farming contract at the end of the current year succeeding his (Colonel Greever's) death, and also whether it has been accounted for by James S. Greever, and if not, what its fair value was at that time, and taking the sale-bill filed as a basis, shall settle the administration accounts of said J. S. Greever. The said commissioner shall also make a settlement between the parties under the contract of May 27th, 1882, according to the terms thereof, except that the commissioner shall ascertain for himself what would be a fair compensation for the services of James S. Greever rendered under said contract, and shall make report thereof to court," etc. And from this decree the case is here on appeal.

*F. S. Blair,* and *N. C. St. John,* for the appellants.

*Buchanan & Buchanan,* and *J. H. Gilmore,* for the appellee.

RICHARDSON, J. (after stating the case in the language aforesaid), delivered the opinion of the court.

This is a controversy between two sisters and their only brother, the sole heirs and distributees of the deceased father, Hiram A. Greever, who died intestate on the 23d of May, 1882. The sole question for decision is one of fact, and is within a very narrow compass; yet so wide and unrestrained has been the range of investigation, that the question at issue has been buried almost out of sight by the introduction of a vast amount of irrelevant matter wholly foreign to the issue made by the pleadings in the cause. The result is that we have a record of over four hundred and thirty pages of printed matter, of which one hundred and forty-five pages are devoted to the single deposition of the defendant himself, while all the other witnesses, some fifty in number, occupy two hundred and eight pages, leaving some seventy-odd pages to the lengthy and decidedly argumentative pleadings and exhibits therewith.

The sole question is, to whom does the property in dispute, that set forth in schedule "A" with the complainants' bill, belong? This being the question for decision, and it being a question of fact, and as the female appellants claim that this property belonged to their father, the intestate, at his death, and since to his estate, and that they, as heirs and distributees, are entitled to share it ratably with the appellee, the remaining heir and distributee, and as the latter does not claim an interest as distributee, but claims the whole subject in his own right as purchaser from his father, the intestate, in his life-time, it is obvious that the question must be solved and the right determined according as the evidence predominates in favor of the one party or the other.

In the first place, it is necessary to lop off and put out of view certain matters to which much of the evidence in the cause has been directed, and which have no necessary connection with or bearing upon the real question in issue.

1st. The defendant in his answer refers to a certain cattle contract existing between himself and his father for some years before the death of the latter. He says, "With regard to the cattle mentioned, there has never been any dispute about these. Your respondent was to furnish the cattle, and they were to be kept upon the place if they could be kept there; if pasture had to be hired, each party paid one half of this, and when the cattle were sold the profits, less what was paid on said pasture and costs of purchase, was to be equally divided between respondent and his father; and respondent always admitted this and never claimed any other interest out of the sales of these cattle." In the depositions in the cause much is said about this cattle contract, which obviously has nothing to do with the question in hand; and as no question was raised in the bill in respect thereto, and as the defendant in his answer admits that there was never any dispute about these partnership cattle, the subject may be dismissed as wholly foreign to the question to be decided.

2d. A large portion of the record is occupied with testimony respecting a farming contract said to have existed between the intestate and his son, James S. Greever, from about the year 1873 to intestate's death. The bill tendered no issue nor made any reference to any such contract. The simple and only statement in the bill touching the relations existing between the father and son is, that James S. Greever lived with his father as a child and member of his family. The only statement in the answer of James S. Greever is that, for the last thirteen years prior to the death of his father, with the exception of the winter months for a part of that time, when James S. Greever was in the legislature, the said Hiram A. Greever and James S. Greever were engaged in farming and cattle-raising together. It is, then, perfectly clear that it is wholly immaterial whether such farming contract existed or not, and that, if it did exist, it is in no way pertinent to the issue made up in this cause. This matter, then, is foreign to and out of the case.

These matters out of the way, we recur to the question, does

the property in dispute belong to the intestate's estate, or is it the property of James S. Greever? If the former, it must be distributed as claimed by the appellants, and if the latter, James S. Greever must be protected in his rights. Whether this property belonged to Hiram A. Greever at his death, and now belongs to his estate and is liable to distribution, or whether it was and is the property of James S. Greever in his own right, is a question to be determined by the weight of evidence.

Let us first enquire into the origin of James S. Greever's claim, and into the character and sufficiency of the evidence relied on to sustain that claim. The property in dispute, as already stated, is set out in schedule "A," with complainants' bill. It constitutes the bulk of· the personal property on the farm of Hiram A. Greever at the time of his death, and includes horses, cattle, sheep and hogs; all the farming implements of every description, and every vestige of household and kitchen furniture, not excepting the piano purchased by the intestate for the use of his daughters, the carpets on the floors, the pictures on the walls, the chairs, tables and table linen and furniture, nor even the bed upon which the intestate slept, nor the table from which he ate his meals, nor any the smallest article of household or kitchen furniture essential to his daily use and comfort.

James S. Greever claims to be the *bona fide* owner of this property by two purchases from his father in the year 1873, one of which was made in the early spring of that year, and embraced part of said property, and the other in the month of June of that year, embracing the residue thereof. He claims that the consideration moving from him was the relinquishment by him of all claims to moneys due by his father to him, the amount of which he does not pretend to state with accuracy, but *thinks* it was some $600 in gold and State bank notes which he let his father have in 1862, and some $200 or $250 since the war. He does not pretend to remember accurately either how much he gave thus for the property, how much of the $600 was gold and

how much bank notes, or what the amount was which he let his father have subsequent to the war. He does not claim that he held or ever had any written evidence of the indebtedness aforesaid of his father to him; on the contrary, he says that in the numerous transactions between them, in which sometimes one and sometimes the other was debtor, no note, bond, or other written evidence was given or taken. He says that, in making the purchases of the property in question, no written list was made and no estimate made piece by piece of the property, but that in consideration of this property, acquired by two purchases, he relinquished all claim to the money which he let his father have during and after the war as aforesaid. He does not pretend to be able to state how much of the debt due him by his father was relinquished on account of the first of said purchases, nor how much on account of the second; but simply insists that he relinquished his claim on his father as the result of the two purchases; nor did he contemplate making the second purchase at the time he made the first, but, as he says, he hesitated about making the second purchase, and only made it at the earnest solicitation of his father. He executed no receipt to his father, and the latter executed no bill of sale to him, nor was any entry made of either transaction on the books, regularly kept, in which the transactions or, at least, the results of numerous settlements between them were entered.

He claims that he took possession of the property by virtue of his said two purchases, and has ever since held, owned and controlled the same as his own; that it was, with the knowledge and consent of his father, ever afterwards listed and assessed in his name, as shown by the assessor's books, and that the tax-tickets therefor were made out against him, and that he has regularly paid the taxes with his own money.

Such, briefly outlined, is the claim of the appellee, James S. Greever. His sisters, the female appellants, utterly deny his claim; deny that he ever purchased or paid for the property as alleged, and insist that the property, though on the commis-

sioner's books and assessed in the name of James S. Greever, was in reality, from the time of said alleged purchases until their father's death, not the property of said James S. Greever, but was the property of their father, and that he had for all said period the unquestioned possession of same, and used, controlled and disposed of it at his pleasure; that all moneys paid by James S. Greever for taxes on said property, so assessed in his name, were refunded to him by their father; that the property was assessed in the name of James S. Greever for a purpose known to them, but they do not disclose what that purpose was; that James S. Greever never, during their father's life-time, pretended to have purchased or to own the property, but admitted to them immediately after their father's death that he had paid nothing for it, and had no claim thereto. And they insist, further, that the property really and truly belongs to their father's estate, and should be equally distributed between them and their brother, the said James S. Greever. Such, briefly stated, is their claim.

Whilst the sole question to be decided is, whether the property in dispute was, at the death of Hiram A. Greever, his property, or was it the property of James S. Greever, yet the case is one presenting some extraordinary features, such as are rarely met with even in the unhappy squabbles so frequent among heirs and distributees in respect to the distribution of their patrimony.

It is a controversy touching personal property of considerable value, yet of insignificant worth compared to the baneful influences too likely to flow from the disruption of family ties, and from faith broken between sisters and brother, to which it has given rise. It is a controversy growing out of a claim asserted by the brother and founded on an alleged contract between him and his father in the life-time of the latter. We must treat the matter as the law treats it.

In discussing the relation of parent and child in its different phases, it is said in 1st Tuck. Com. p. 130: "It may not be im-

proper here to add that contracts between parent and child are regarded in equity with a jealous eye." Citing 1st Vez. 400; 2d Atk. 159, 254, 258; 1st P. Wms. 639, and 3d Br. C. 156. This doctrine is recognized in all the books, and is due to the relation which exists between parent and child. Hence, in all such cases, when the *bona fides* of the transaction is brought in question, it is requisite that the proof be clear, cogent and convincing.

In *Poorman* v. *Kilgore*, 26 Penn. St. 365 (67 Am. Dec. 425), we find the following instructive passage: " We may notice still another principle of law that is applied very beneficially to restrain the exceptions to the statute " (meaning the statute of frauds), "and which is of special importance in this case, though its application is not peculiar to cases under this statute. We allude to the law of evidence that grows out of the family relation. It is so usual and natural for children to work for their parents, even after they arrive at age, that the law implies no contract in such cases. And it is so natural for parents to help their children by giving them the use of a farm or house, and then to call it theirs, that no gift or sale of the property can be inferred from such circumstances. It is so entirely usual to call certain books or utensils or rooms or houses by the names of the children who use them, that it is no evidence at all of their title as against their parents, but only a mode of distinguishing the rights which the parents have allotted to the children as against each other, and in subjection to their own paramount right. The very nature of the relation, therefore, requires the contracts between parents and children to be proved by a kind of evidence that is very different from that which may be sufficient between strangers. It must be direct, positive, express and unambiguous. The terms must be clearly defined, and all the acts necessary for its validity must have especial reference to it and nothing else "; citing *Mehaffy* v. *Share*, 2 Pa. 365; *Hack* v. *Stewart*, 8 Pa. St. 213; *Bush* v. *Bush*, 9 Id. 262; *Lantz* v. *Frey*, 14 Id. 201; *Saunders* v. *Wagonseller*, 19 Id. 251; *Lantz* v. *Frey*, 14 Id. 366;

*McCue* v. *Johnston*, 25 Id. 308 ; *Hugers* v. *Walker*, 12 Id. 175. And the judge proceeds: "The importance of this rule is very apparent, for it requires but a glance over the cases of this class to discover how sad has been the experience of the courts in family disputes growing out of the exceptions which have been allowed to this statute; and how many and how distressing must have been the ruptures of the closest ties of kindred that have been produced and perpetuated by the encouragement thus given to try the experiment of extracting legal obligations out of the acts of parental kindness."

In the light of these principles, let us look to the evidences of ownership relied on to sustain the claim of James S. Greever under this alleged oral contract of purchase. It is unquestionably true, and it is so conceded on all hands, that the property was listed as early as 1873, and assessed and taxed as the property of James S. Greever, and had been so listed for taxation and put on the commissioner's books by his direction, with the knowledge and assent of Hiram A. Greever. This appears by the deposition of the commissioner himself; but other than this there is nothing evincing that there had been a *bona fide* sale of the property in dispute by the father to the son, as will be seen from the remaining testimony offered by the appellee.

M. B. Tate was introduced by the appellee. He was the owner of a debt of the Farmers Bank on L. H. Tate, B. F. Aker and Hiram A. Greever, the latter being a surety or endorser. On this debt judgment was obtained, and execution thereon went into the hands of R. S. Bonham, sheriff of Smyth county, as we shall presently see when considering the testimony of said sheriff; and we shall see, too, that this debt is the key that unlocks and opens to view much of the mystery connected with this alleged sale by father to son. Tate testifies that the sheriff (Bonham), after having an interview with Hiram A. Greever, and learning that his personal property was claimed by James S. Greever, came to him (Tate) and required an indemnifying bond, which he refused to give, without assigning any reason

for his refusal; and he says that Bonham insisted on his giving the bond that he might sell the property on the Greever place. And said Tate also deposes that before he became the owner of said bank debt, he had a conversation with Hiram A. Greever about the transfer of his property, in which the latter said to him that he had no property, having turned it all over to his son, James. Tate says this conversation and statement occurred at his home when H. A. Greever was urging him to subscribe to the erection of a new railroad depot; and it appears that said Greever made the statement about having *turned his property over* to his son by way of excusing himself from subscribing for the erection of the depot; for Tate says, that he subscribed and pushed the paper to Colonel Greever and asked him to do likewise, but that he declined, making the statement above about *turning his property over* to his son, whereupon Tate replied, " Colonel Greever, I never would ask a man to do a thing I would not do myself."

Then the appellee introduced said Bonham, sheriff. He makes this statement: "About the month of June, 1877, there was an execution in my hands, as sheriff of Smyth county, against L. H. Tate, B. F. Aker and H. A. Greever, in the name of the Farmers Bank, claimed by M. B. Tate, for principal, interest and costs, amounting to about $1,400. There being no personalty of Tate and Aker that I knew of, I went to see Colonel Greever about it. I saw him at the gate in front of his house, and showed him this execution and asked him what he proposed to do about it. He said that he did not have personal property that the debt could be made out of; that he had become involved in money matters; that he had to raise quite a large sum of money, and that he had no other means of raising it except out of the stock on the place, and that his son, James, had some money, and that he had sold his stock on the place to James." After some other questions and answers having no real connection with the question at issue, Bonham is asked if his father and Colonel Greever were not intimate friends, and

if witness did not frequently hear Colonel Greever, in conversations with witness' father, during the last years of said Greever's life, say that he was managing the place where he lived for his son, James? This question was objected to, and properly objected to, for it not only plainly indicated the answer desired, but was certainly not pertinent to anything in issue. But the witness answered: "Yes, sir; my father and Colonel Greever were very intimate friends. I know of his staying all night with my father frequently when I was there myself. I heard him tell my father that he had become embarrassed in money matters and had to sell his *stock* to James, and that he was now managing the farm for his son, James, and that he had no interest in the *stock* on the place." This answer, too, was objected to as irrelevant, which it plainly is; and of just such irrelevant and impertinent matter is the record, in the main, made up, and all of which should have been suppressed by the trial court, it all having been objected to at the time.

Again, this witness (Bonham), on cross-examination, says: "At the interview and conversation I had with Colonel Greever at his gate, spoken of in my deposition above, he said that he had no household property worth attempting to make a debt of that size out of; that he had arranged his household property among his children; he said there was a piano over there in the house that was not subject to his debts, that it belonged to Jennie and Rebecca."

And further on in his cross-examination, Bonham says in substance that James S. Greever was present at a part of the conversation between him and Colonel Greever at the front gate of the latter; that after Colonel Greever got through with a part of his statement about selling his property to James, he said to Colonel Greever that property found in the possession of the debtor was *prima facie* his and subject to levy, and that the party claiming the property would have to set up a claim to it; that Colonel Greever then called his son, James, up, and he set up a claim to the property, by purchase from his father, in

about the same words the Colonel did ; and that Colonel Greever said that he had sold his *stock* on the place to James to raise a certain sum of money that he had to raise ; that James said the same thing in regard to the *stock* on the place ; that neither of them said anything to witness about any sale of the household property that he remembers ; that nothing further was said except about the stock on the place, and that James said he had purchased all the *stock* on the place. And then the witness was pressed, especially in the tenth question propounded to him on cross-examination, to tell what had occurred in other and subsequent conversations with Colonel Greever to that at his front gate, but nothing was elicited except a repetition of what he had already said ; and his deposition was closed ; but in a very short time the witness demanded, as he had the right to do, to make a further statement or answer to said question No. 10, which being allowed, he said : " Colonel H. A. Greever said to him that he would not do a thing of this sort upon his own liabilities, but that he did it for the purpose of fixing the debt on B. F. Aker and L. H. Tate ; that their real estate was abundantly good for this debt ; that he never proposed to repudiate one dollar of his contracts."

This, except the deposition of James S. Greever himself, presently to be referred to, is all the evidence offered by him that can be said to give the least support to his claim ; and the deposition of Bonham, especially his last and supplemental statement, when taken in connection with the other evidence on behalf of the appellee, goes very far towards lifting the curtain and exposing to open view the real nature of the transaction between father and son, which is the base-rock of the appellee's claim, and strongly tends to demonstrate that the claim is not supported even by his own evidence, and that it has no real foundation either in fact or in law. But it may be asked, Why so ? The answer is simple and easy. It is because James S. Greever claims all the property in dispute, as set out in schedule " A " with bill, which consists of all the valuable live

stock on the place, all the numerous and valuable farming implements, all the household and kitchen furniture, and all other articles enumerated in said schedule, except two side saddles, the claim to which he has relinquished since filing his answer ; while Bonham, his principal witness, proves that in the interview at the front gate of Colonel Greever, he (Greever) only stated that he had sold the *stock* on the place to his son, James, and that the latter, who was called up, claimed not to have bought anything more. It is because, in the same interview, Colonel Greever distinctly stated that he had become financially embarrassed, and had to raise a large sum of money; that his son had some money, and that to raise the money he had sold the *stock*—not stock, farming implements and household and kitchen furniture—to his son, James, thus clearly evincing that he had sold the *stock* only and for cash, and had received it from his said son at the time of the sale; while James S. Greever now claims not only the live stock, but all that is set forth in schedule "A," and that the consideration for the purchase was not cash paid, but the relinquishment of all claim to an old debt due by his father to him, the amount of which debt he does not pretend to remember or state with accuracy. And yet we find (by Bonham's statement) James S. Greever standing by and claiming, in June, 1877, four years after the pretended purchases of 1873, only that he had purchased the stock, meaning, of course, the live stock on the place; for Bonham states that Colonel Greever only claimed to have sold the stock, and that James S. Greever, when called up, stated his purchase in about the same words it had been stated by Colonel Greever. It is because while Tate, the owner of the bank debt, and Bonham disagree as to whether there was any reason assigned for declining to give the indemnifying bond—the former saying that he declined without giving any reason, while the latter says that Tate gave as the reason that the real estate of the principal debtor made his debt amply secure—they do agree in the more important particular that Bonham, the sheriff, insisted that Tate

should give the indemnifying bond, thus evincing that the sheriff, at least, was well satisfied that there had been no real sale, even of the live stock, by the father to the son ; and because the testimony of Tate does not prove that Hiram A. Greever admitted that he had sold to James S. Greever the property claimed by the latter, or any property whatever, but only that Colonel Greever said he had *turned all his property over* to his son, James, which would embrace both real and personal estate, and which by no means amounts to clear, strong and express proof of the claim asserted by James S. Greever, and nothing else.

And finally, it is because the evidence relied on by James S. Greever is uncertain and varient as to what it tends to prove, and so far from being direct, positive, express and unambiguous, it is vague, uncertain and unreliable, and fails to clearly define the time, terms, or consideration of the contract of bargain and sale it is intended to uphold. And the deposition of R. S. Bonham, especially in his cross-examination, shows beyond all cavil that he, after his interview with Colonel Greever at the front gate of the latter in June, 1877, had unquestionable information to the effect that there had been no sale of the property in question by Colonel Greever to his son, James; and this ·is made clear beyond dispute by the supplemental answer of this witness to the tenth question on his cross-examination, whereby, though with evident reluctance, he discloses the admission to him by Colonel Greever that this property arrangement between him and his son was only intended to shield his property from sale to satisfy said debt, Colonel Greever saying he would not do such a thing as to his own liabilities, and that he did it for the purpose of making ·the real estate of the principal debtor discharge the debt, and that he would never repudiate one dollar of his own contracts.

There is no such thing as escaping the damaging effect of Bonham's disclosure—damaging not to him or to the general character of his ·statements, but to the claim of James S. Greever,

which he was introduced to uphold.   It cannot be true, as seems
to have been supposed by the judge of the circuit court, that
Colonel Greever made this admission to Bonham, as sheriff,
execution in hand, at the interview at Colonel Greever's front
gate, in June, 1877, for if this was so, the fact would indeed be
damaging to Bonham, and he could not be excused for going
away, execution in hand, and unlevied, in the face of the debtor's
admission that he had not sold the property to his son.   It is
perfectly apparent that Colonel Greever's admission was not
made at that interview, but later, and, perhaps, long after the
execution had been returned "no property," etc.; for the cross-
examination of Bonham shows that he was pressed for informa-
tion subsequently obtained; and in the absence of anything to
suggest a different conclusion, it must be presumed to be as
unlikely that Bonham, as sheriff, would have been guilty of
such flagrant neglect of duty, as that Colonel Greever would
have made the admission to him when he first called on him,
execution in hand.

A mere glance at the evidence of the appellee, thus far con-
sidered, is sufficient to show the weakness of his claim, if not,
indeed, sufficient to entirely overthrow it.   The question, and
only question, being one of ownership, it must be conceded that
upon the bill and answer alone, the case would be with the
appellee.   It must also be conceded that the fact of the transfer
of the property on the commissioner's books from the name of
Colonel Greever to that of James S. Greever, by the direction
of the latter, with the knowledge and sanction of the former,
and its so continuing until the death of Colonel Greever, pre-
sents a *prima facie* case of ownership by James S. Greever,
which must be overcome by competent and sufficient evidence
in order to overthrow the *prima facie* case thus made in his
favor.   But the case is far from resting on the bill and answer
alone, or on the presumptive title in him by reason of the prop-
erty being on the commissioner's books as aforesaid.   It has
already been shown that the evidence, thus far considered, so

far from sustaining, greatly weakens, if it does not entirely destroy, the appellee's claim. And it is difficult to perceive upon what ground that claim can be upheld in the face of the facts deposed to by R. S. Bonham, the principal witness introduced by the appellee, and where no effort was made in the court below to contradict or discredit him.

But James S. Greever gives his own deposition, though his father, the other party to the alleged contract is dead. He was objected to as an incompetent witness, but the court below overruled the objection and received his evidence. This question will be deferred for the present, so as to consider his testimony in connection with that opposed to him. This we do, not because we deem him a competent witness, nor because, conceding his competency, his testimony is in all respects admissible; for the great bulk of it is as to the declarations of his father and others, and about matters wholly irrelevant and immaterial, for which numerous objections were endorsed, and all of which, so objected to, should have been suppressed by the court below. But it was not done, and we will proceed first to examine his testimony in connection with that on the part of the appellants, and to show that his own deposition weakens rather than strengthens his case.

The female appellants, Mrs. Saunders and Mrs. Perkins, both gave their depositions in the cause, and both of them testify positively that their brother, James S. Greever, after the death of their father, told them that he had paid nothing for this property and that he had no claim to it. James S. Greever denies making this statement, and admitting that he had repeated conversations with them, separate and together, proceeds to state what he did say, his statement being entirely different from anything they had testified to. They were called in rebuttal, and they each deny his statements, and emphatically reiterate their former statements. Here, then, we have two witnesses against one.

They both, in their examination-in-chief, state positively that

they never heard their brother claim that he had purchased the property until after he had qualified as administrator, and that he so qualified without their knowledge or consent. In his deposition he denies their statements, and in respect to the first of them deposes in this language: "I mean to say I heard my father tell them, that is the girls, Mrs. Saunders and Mrs. Perkins, in his life-time, that he had sold this property to me, or that I had bought it, and I mean to say that after the purchases and transfer of this property they were in hearing when my father and myself were talking in regard to it; my recollection is that I heard him tell the girls so, not only about the time of purchase, but afterwards." They in rebuttal deny ever having heard any such conversation between their father and brother, deny that either told them of any such sale and purchase; and they repeat their former statements and say that they never heard their father say he had sold the property, and that he always claimed it as his own and controlled it accordingly. Here again is the positive testimony of two witnesses against one.

They, the two sisters, in their examination-in-chief, state positively that their brother, James S. Greever, agreed with them, after their father's death, to divide this property, as well as the balance of the estate, equally between the three. James S. Greever, in his deposition, says that he did agree to divide this property with them upon the condition that they would agree to divide the real estate as proposed by him, and upon the further condition that they refund to him the debt he had relinquished on his father, with interest. They in rebuttal deny this statement and again reiterate their former statements. And they say: It was immediately after the death of their father that their brother agreed to divide this property, and that the agreement was subject to no condition, and they say the agreement was this: "General Greever was to take charge of the property and manage it as though his father had not died, gather the crops, etc. At the end of the year all was to be equally divided."

Again, James S. Greever deposes: "I remember distinctly saying, after my father's death, to my sisters, that I owned more horses than I had need for, and that I then thought of disposing of some. I also told them that my father, just a short time before his death, had said to me that he thought that I could very well get along with fewer horses, and advised me to sell some. I mean my father advised me to sell some of my horses." In rebuttal they testify that they were not present and know nothing of such conversation, and that they never knew that he owned any but two horses, the same about which they spoke in their examination-in-chief.

About this matter, Mrs. Saunders, in her second deposition, speaks fully and clearly. She says: "My brother is mistaken. I never heard my father say that he had sold the property to my brother. It was recognized as my father's property; he always owned and controlled it as long as he lived. I never heard any conversations as detailed. I never heard my brother claim this property till long after my father's death. My brother is mistaken; the property when spoken of was always recognized as my father's, and my brother always recognized it as my father's property, with the exception of his own individual property, as heretofore mentioned in my deposition. I mean I never heard of my brother claiming this property until some time after my father's death. He said then that he might claim it, as it was on the commissioner's books, but that he would not do it, as it would not be right; that he had not bought it nor paid anything for it. I mean to say that this conversation about not claiming the property was immediately after my father's death, and that it was some time after his death when he did claim it."

Now, looking at the deposition of James S. Greever in the light of the facts deposed to by his two sisters, and in the light of the admission made by Colonel Greever to R. S. Bonham, as testified to by the latter, how is it possible, when we apply the law to the facts, to reach any other conclusion than that the

appellee's case is not strengthened by his own deposition; that whatever may have been the object in putting the property in dispute on the commissioner's books in the name of James S. Greever, it was not the result of a *bona fide* sale to him by his father, Hiram A. Greever, and that it conferred no title upon James S. Greever; that it belongs not to James S. Greever, but to the estate of his deceased father, and was the property of the father during all the time it remained on the commissioner's books in the name of the son, and is now part of his estate and distributable equally between the two sisters and the brother.

Touching the right of the sisters to share in the distribution of this property, so conclusively established by an abundance of competent evidence, there is one other circumstance that is powerfully corroborative not only of their testimony, but of the justness of their claim    We allude to the written agreement, already set out, of May 27th, 1882, only four days after the death of the intestate, which was signed by all the parties.

This paper evinces the utmost confidence reposed by the sisters and their husbands in the brother, James S. Greever. The father had died in the midst of the cropping season, after having made contracts and engagements with reference to the current year; and it was thought best for the interests of all the distributees to continue the farming operations for the year under the management of their trusted brother, James S. Greever, who was one of the distributees, equally interested and more familiar with the decedent's plans for the year than any of the others.    Hence the agreement, after setting out the fact that by the death of Hiram A. Greever the two sisters and brother are the joint owners of all the intestate's estate, real and personal, proceeds to confer large and liberal powers upon the brother for the then current year.    It provided that James S. Greever should, during that year, and longer if it should be deemed necessary, have " the entire management and control of all this property *as he has had control of it heretofore,* to manage and

attend to as he may deem best for the *joint interest* of himself and his two sisters," and with full authority for that purpose to make any sales or purchases of personal property that he might think advisable and deem promotive of the interest of all.

And, in conclusion, it is expressly stipulated that as James S. Greever's whole time will necessarily be employed in the performance of this engagement, to the exclusion of all business other than to manage this property, he should have such compensation therefor, out of the joint property, as the three persons named in the agreement should say he is entitled to.

It is difficult to conceive how this agreement could be held to refer to anything other or less than all the personal property on the Greever lands, except the few articles before referred to and conceded to be the property of James S. Greever. It will be observed that nothing is excepted, and that for the management of all this *joint property*, James S. Greever is to be compensated, he devoting his entire time thereto, and to manage it "as he has managed it heretofore." How directly does this language comport with the testimony of the two sisters that it was their father's property, and that their brother lived with their father as a child and member of his family and used or controlled the property as their father's and subject to his orders and supervision. And how exactly does the language, "as he has managed it heretofore," agree, in its general bearing, with the direct and positive testimony of the two sisters, that their brother, after the death of their father, and just preceding the written agreement under consideration, admitted to them that this property was not his; that he had paid nothing for it and had no claim to it.

Again, without the property in dispute, or other property of the kind, it was impossible to continue the farming operations for even one day. Why did not James S. Greever, if this property was his, when he was so carefully stipulating for compensation for his personal services, stipulate also for compensation for the indispensable use of this large and valuable personal

property, without which the crops could not be made and saved. Is it conceivable that he could or would have overlooked so important a matter ? Will it be said that he left this large and important matter to his sisters.? Then why, and upon what principle, did he stipulate for the minor and leave the major to take care of itself? Looking to this written agreement in the light of the other evidence and all the surrounding circumstances, can its peculiar phraseology be accounted for or reconciled with any other theory than that the property in question was not his, he having not paid anything for it and having no claim thereto, as admitted to his sisters immediately after the death of his father ? We think not.

Yet again ; when we look to the property appraised (as shown by James S. Greever) and sold as all the personal property belonging to the estate, we find it consists of comparatively very little except grain and hay and the half interest in the lot of yearling cattle. What was it, then, to which James S. Greever was to devote all his time? Was it to sell and buy in the interest of all the joint owners, and for which he so carefully stipulated for compensation ? It could have been nothing else than the property now claimed by him as his own, nor can the language of the agreement be made to apply to anything else. From the language of the instrument, and the surrounding circumstances, the only rational conclusion is, that James S. Greever, though the property was on the commissioner's books in his name, from 1873 until his father's death, never purchased it, never paid anything for it, did not own or claim it until long after his father's death and after the agreement of May 27th, 1882, and cannot now claim it. There is in this written agreement everything in support of the claim of the sisters—nothing that tends in the remotest degree to uphold that of the brother.

As to the question of ownership, as evinced by Colonel Greever's uniform and unquestioned possession and control of the property in dispute, the circumstantial evidence is overwhelmingly

that he, and not his son, was the true owner. More than a score and a half of witnesses, consisting of members of the family, neighbors and friends, merchants, family physician, wagonmaker, shoemaker, blacksmiths, stock buyers and employees on or about the farm, depose to a great number of facts and circumstances utterly inconsistent with any other idea than that Colonel Greever not only possessed and owned this property, but, without restraint or hindrance, exercised absolute dominion over the same, disposing of it as to him seemed best. He, in the presence and with the knowledge of his son, sold horses and took the bond payable to himself, and, when the bond became due, by his son, demanded and received the money as his. He sold another horse and took the pay in threshing grain. He bought blooded bulls to serve his cows, bred his mares to horses of his own choosing, sold sheep and wool from his flock, bartered wool for jeans and grain sacks to be used on his farm, and was careful to mark the new grain sacks with his own initials.

These, and similar acts of ownership, were continuously exercised by Colonel Greever from 1873, the time of the alleged purchases by James S. Greever, down to the time of his death, in 1882. During all that period not one act is proved indicating that this property belonged to James S. Greever, save and except the bare fact that it was on the commissioner's books in his name; nor is a single person found who ever heard that he claimed it, except R. S. Bonham, and that matter has already been sufficiently disposed of. Then, if we leave out of view the direct and positive testimony of the female appellants as to James S. Greever's admission to them that he had paid nothing for the property and had no claim thereto, and the coinciding admission of Colonel Greever to Bonham, and look alone to the other evidence, as stated above, it is ample to overturn the claim of James S. Greever and establish that of his sisters, the female appellants. In fact, no just conception of the facts and law of the case will permit the rejection of their claim. So clear,

strong and cogent is the presumptive evidence of ownership by Colonel Greever that it, independently of the direct and positive evidence, is all sufficient for the purposes of the appellants. In discussing the subject of presumptive evidence, Mr. Greenleaf says: "So, also, as men generally own the personal property they possess, proof of possession is presumptive proof of *owner-ship.*" 1 Greenl. on Ev. § 34. The material facts and circumstances directly testified to in this case by an unusually large number of witnesses, clearly evince not only that Colonel Greever had the unquestioned possession and control of this property, but that he, as such owner, continually exercised absolute dominion over it.

There is yet other circumstantial evidence strongly opposed to the claim of James S. Greever. His father, Hiram A. Greever, was a painstaking, cautious and prudent man. He kept regular books of account, in which he charged himself with what he owed and credited himself with what he paid. By these books he settled with merchants, mechanics, laborers and others, and it was rare that his books did not prove accurate to a cent. On these books there is no entry of the indebtedness of father to son, which the latter claims was relinquished by him in consideration of the property here in dispute, though the books of the father do contain entries as to frequent transactions and settlements between him and this son. To break the force of this fact, James S. Greever goes far back in his father's life and in his own recollection, and recounts a number of important business transactions had by his father which are not mentioned or entered on the books. And in the long list of transactions referred to, which are entered on the books, he mentions two that weigh heavily against him. 1st. He refers to the fact that many years before his father's death he, James S. Greever, got a neighbor, Mr. Seabright, who was going to Baltimore, to buy him a hat; that Seabright purchased and brought the hat to him, which he offered to pay for, but Seabright said no; I have, or will have, some transactions with your father, and I will

settle it with him; that in subsequent dealings with Seabright his father paid for the hat; that some time afterwards, on looking over the books, he discovered that his father had not charged him with the price of the hat, and that he called his father's attention to the omission; that his father said, "I intended the hat as a present to you"; that he (James S. Greever) said, if you don't charge it, I will; and that his father still refusing, he went to the book and charged himself with the hat. This certainly looks like father and son dealt with each other on strictly business principles. 2d. In his deposition, James S. Greever refers to a settlement between him and his father, in October or November, 1865, by which he fell in debt to his father in the sum of $650, which sum was charged to James S. Greever on his father's books. Now, the major part of the old debt (some $800), which James S. Greever said he let his father have, was furnished, he says, in 1862, or about that time. Why did he not have the $650, in which he fell in debt to his father only three years later, credited on his father's indebtedness to him? Why submit to be charged by his father, upon settlement in 1865, with $650, when, according to his claim now, his father was indebted to him? These things are inexplicable except upon the theory, supported by the evidence in this case, that the father was not indebted to the son.

We have considered the case as if James S. Greever was a competent witness, he having been so considered and treated in the court below. It only remains to consider whether he was a competent witness, his father, the other party to the transaction, which is the subject of investigation, being dead. If competent at all it is by reason of the language contained in the 22d section of ch. 172, Code 1873, as amended and re-enacted by ch. 256, Acts 1876–'7, p. 265. In the act as amended, after enumerating the cases in which the common law rule remains unaltered, the following language occurs: "and when one of the original parties to the contract, or other transaction, which is the subject of investigation, is dead, or insane, or incompetent to tes-

tify by reason of infancy or any other legal cause, the other party shall not be permitted to testify in his own favor, or in favor of any other party having an interest adverse to that of the party so incapable of testifying, unless he shall be first called to testify on behalf of such last mentioned party, or unless some person having an interest adverse to that of the party so incapable of testifying shall have previously testified to some fact occurring before such inability accrued," etc.

It is plain that James S. Greever was incompetent to testify in his own behalf, and that the court below erred in overruling the objection to his competency and in receiving his deposition. Of course he was incompetent at common law. Nothing in Code 1873, ch. 177, §§ 21 and 22, as amended by the act above quoted from, alters the common law rule in such case. His father, one party to the transaction under investigation, being dead and incapable of testifying, the son, who is the other party to that transaction, is also incapable under section 22, as neither of the several conditions whereupon *he* might have become capable exist here. That is, he was not called on to testify in behalf of the other party, who was dead, and no person having an interest adverse to that of that other party had testified to any fact that occurred before that party became incapable by death, it being perfectly clear that the sisters of James S. Greever, the living party to the transaction under investigation, have no interest adverse to their father, the other and dead party.

But it has been shown that, with or without his own deposition, James S. Greever has no case. If, as is barely possible, he does not get from his father's estate all that he thinks himself entitled to, he can only attribute his failure to a singular neglect to protect himself by that prudent caution and foresight which, as a rule, he is proved to have exercised in his ordinary business transactions. But it is not for this court to indulge in speculations as to possibilities or even probabilities. We can only deliver the conclusions and result which flow from the law and the facts, deeply regretting the bitterness of strife to which this

unfortunate family difference has given rise.   We are clearly of opinion that the decree of the circuit court is erroneous in every particular, and that it must be reversed and annulled, and the cause remanded with instructions for such further proceedings as may be necessary to a final decree in the cause.

DECREE REVERSED.