○ CLINCHFIELD COAL CORPORATION V. CRUISE'S ADMINISTRA-
TOR.

September 9, 1915.

1. MASTER AND SERVANT—*Absence of Rules—Method of Doing
Work—Assumption of Risk.*—Where the lack of rules and the
uniform practice and method of doing work in a mine are
within the personal knowledge of a servant who makes no
protest on that account, he assumes the risk of any danger in-
cident to such lack of rules and as to such method of work.

2. MASTER AND SERVANT—*Assumption of Risk—Absence of Brake
on Mining Car.*—While brakes on a mining car would be an
additional element of safety in using the car, if the lack of
such brakes was a general and permanent condition prevail-
ing throughout the mine, and it is a necessary and inevitable
inference from the evidence that a servant knew of this con-
dition, he is held to have assumed the risk of any dangers in-
cident thereto.

3. MASTER AND SERVANT—*Assumption of Risk—Obvious Dangers.*—
Where the alleged causes of dangers are so open and obvious
and the knowledge or opportunity for knowledge on the part
of a servant so complete as to leave no doubt that he knew or
ought to have known all about them, the assumption of risk is
not a question for the jury, but as a question of law bars
recovery.

4. MASTER AND SERVANT—*Defective Premises—Negligence—Proxi-
mate Cause.*—If it be conceded that the defendant's premises
were in a defective condition owing to his negligence, still it
is not shown in the case at bar that this negligence was the
proximate cause of the injury complained of.

5. MASTER AND SERVANT—*Negligence of Master—Other Probable
Cause.*—If it is just as probable that an injury was inflicted
upon a servant by one cause as by another, for only one of
which the master is responsible, there can be no recovery by
the servant.

6. MASTER AND SERVANT—*Negligence—Improbable Dangers.*—The
master is not bound to foresee and provide against the un-

> usual and improbable. It is the probable and not the imbrobable danger which the master must foresee.

Error to a judgment of the Circuit Court of Dickenson county in an action of trespass on the case. Judgment for the plaintiff. Defendant assigns error.

*Reversed.*

The opinion states the case.

*W. H. Rouse, J. Norment Powell* and *Morison, Morison & Robertson,* for the plaintiff in error.

*Sutherland & Sutherland,* for the defendant in error

KELLY, J., delivered the opinion of the court.

Jewell Cruise was killed by a runaway car in a mine owned and operated by the Clinchfield Coal Corporation. His administrator brought this action alleging that his death was due to the negligence of the company, and recovered a judgment for $6,000 to which this writ of error was awarded.

The accident occurred in January, 1911, and the case is not in any way affected by the provisions of the mining act of 1912.

At the conclusion of the evidence on both sides the defendant demurred thereto, but the court overruled the demurrer and entered judgment in favor of the plaintiff for the damages fixed in the conditional verdict of the jury. This action of the court is assigned as error.

The material facts, giving to the plaintiff, in accordance with the rule, the benefit of the most favorable interpretation of the evidence, may be stated as follows: The plaintiff's intestate, Jewell Cruise, was a young man about 20 years of age. He was an experienced coal miner, having been at work in coal mines for five or six years, in various

capacities, including the positions of motorman and mine boss. At the time of his death he was employed by the defendant company in a mine at Dante, Va., as a coal miner (digging coal and loading it in mine cars), and had been so engaged for some two or more months. He was married and lived near the mouth or entrance to the mine. His place of work was several hundred yards back in the mine, beyond the point at which he was killed. The mine consisted of two parallel entries, known as the air course and the main entry, about twenty-four feet apart, with frequent break-throughs between them, and with rooms turned off from each at short intervals, the rooms turning off to the right on the air course and to the left on the main entry. Tracks were placed in both of these parallel entries, with switch tracks running off into the rooms, and over these tracks mine cars were operated by means of an electric motor for the purpose of hauling out the coal. The aforesaid entries were also used by the coal miners as passage-ways in going to and from their work. The men were supposed to step to the right side when meeting cars. For a short distance along near where the accident occurred the rib or side of the air course was too close to the track on the right to make it safe for a man to stand on that side while cars were passing. An electric trolley-wire, unguarded and highly charged, was suspended near the roof of the mine a little to the left of a perpendicular from the left-hand rail of the track. This, together with the "gob" and refuse on that side of the track, made it in the ordinary case more inconvenient and somewhat more dangerous to try to pass a car on the left than on the right. The cars were distributed through the mines and placed in the rooms by a motorman and brakeman. There was no published rule of the company on the subject, but it was the recognized custom and duty of the brakeman to cut the cars loose from the motor and scotch or secure them when

left in the rooms to be loaded, and this was usually done by placing a tie or a mine prop under one rail and on top of the other rail under a wheel, or otherwise fastening the cars in place by ties, props or blocks of wood. The safer way would have been to set the brakes on the car and use the scotch as well, but brakes were seldom in shape for use in that mine.

On the day of the accident two cars had been placed in room No. 7 to be loaded by a miner at work there, whose name was Charlie Williams. Room No. 7 turned off to the right from the air course. The track ran out of this room on a descending grade of from eight to ten *per cent.* The brakeman who cut these cars loose from the motor and scotched them was Bert. Cruise, a cousin of Jewell Cruise, and an experienced miner and brakeman. He tried the brakes but they would not work, and he made the cars as safe as he could with a crosstie, believing at the time he had made them entirely secure. These same cars had been in this room earlier in the day, were loaded while scotched with the same tie in the same way, and had stood there until the motor came for them. He had never scotched cars in any other way in that room. Charlie Williams, the miner who loaded them, also examined the scotch and thought it would hold. There were more props in the room if they had been thought necessary.

Jewell Cruise, the plaintiff's intestate, came into room 7. on his way to dinner, as he frequently did, spent about ten minutes with Williams, who was his uncle, looked into the car the latter was loading, and was around and near the cars all the time he stayed there. Leaving room No. 7, he went home for his dinner and was hurrying back to work when he was killed. His body was found under one of the two cars above mentioned, which a few moments theretofore had, from some unknown cause, escaped from room 7 and run out into the air course. What caused the

cars to escape, or just how they happened to run over Jewell Cruise, is not known. No persons except Williams and Cruise were in room 7 after the cars were placed there until the accident happened. Williams cannot explain how the cars got away, and nobody saw them strike Cruise. The claim of the plaintiff, as stated in the brief of his counsel, is that the runaway cars "struck the deceased while on his way to work about 40 or 50 yards from Williams, at the switch leading from room No. 7 on the air course, which connects between rooms 5 and 7, threw him against the trolley wire and carried him down near the mouth of room 5, the front wheels having passed over his body, where he was found dead, with his back across the rails, a few minutes afterwards." That the runaway cars in some way caused his death is a necessary conclusion; that they did so in the manner recited in the foregoing quotation is one of the conclusions which the jury upon the evidence might have reached as to the manner in which this acknowledged cause produced the effect; but, accepting this conjecture (for it is a conjecture), has the plaintiff established a case for recovery?

This brings us to a point at which, before dealing further with the facts, a statement of the theory on which the plaintiff seeks to recover will be appropriate and helpful in reaching a proper decision. His theory, or theories, may be summarized in an extract which we here quote from the brief aforesaid as follows: "(1) The defendant was negligent in failing to promulgate, and bring to its employees' notice, rules and regulations for spragging, stopping or braking its cars when left in a room without the motor; (2) in failing to provide adequate brakes, proper check blocks, sprags or braces; (3) an unsafe place to work or go to and from work at the mouth of room 7; (4) that the switch leading from the air course to room No. 7, upon which the cars were run, was dangerously con-

structed and too near the rib on the right and a live wire on the left; (5) and in failing to guard the live wire on the air course near the mouth of room No. 7 against contact because said wire was highly charged with electricity." We have inserted the numbers (1) to (5) for convenience, but otherwise the foregoing is a literal quotation and fairly states the case charged in the declaration and claimed to be sustained by the proof.

A careful consideration of each of these alleged acts of negligence on the part of the defendant company leads us to the conclusion that there can be no recovery for the plaintiff upon either of them. A brief discussion of these grounds in their order will, we think, show that this conclusion is correct.

(1) Assuming, but not admitting, that in so simple a matter as the scotching of a mine car to hold it in place while being loaded, there was a duty upon the defendant company to promulgate rules, the fact remains that the lack of such rules and the uniform practice and method of doing this work in that mine were matters necessarily within the actual knowledge of the decedent. The record leaves no room for doubt or dispute upon this point. There is no hint that he ever made the slightest protest, and it therefore plainly follows that he assumed the risk of any dangers incident to such lack of rules and to such method of work. *Parlett* v. *Dunn,* 102 Va. 459, 464, 46 S. E. 467; *Southern Ry. Co.* v. *Foster,* 111 Va. 763, 768, 69 S. E. 972; *Moore Lime Co.* v. *Richardson,* 95 Va. 326, 335, 28 S. E. 334, 64 Am. St. Rep. 785; I Sherman & Redfield on Neg. (6th ed.), sec. 214-a, and authorities cited.

It is equally plain that the second ground of negligence upon which the plaintiff relies is not sufficient to sustain a recovery. There was no failure to furnish the kind of instrumentalities commonly used and relied upon in this mine for scotching cars. If these instrumentalities were

improperly and negligently used upon this occasion, the fault lay with Bert Cruise, a fellow servant, for whose negligence the company was not liable.   But Cruise did not look for more than the one scotch because he had used the same one in that room often before and believed it would make the cars safe and secure this time.   There were other props near by in abundance if he had thought it necessary to use them.   As to the lack of brakes, while it conclusively appears upon the demurrer to the evidence that it would have added an additional element of safety to have the cars equipped with brakes in working condition, and that these cars were not so equiped, yet it also appears with equal conclusiveness that the lack of brakes was a general and permanent condition prevailing throughout that mine, a well known incident to the method in which the work was being done.   It is a necessary and inevitable inference from the evidence that Jewell Cruise knew of this condition, and, this being true, he must be held, under the authorities above cited, to have assumed the risk of any dangers incident thereto.

The remaining grounds of negligence set out in the analysis above quoted from the brief of counsel for plaintiff, namely, (3) the unsafe place in which to work and to go to and from work, (4) the proximity of the rib to the track on the right, with a dangerous wire on the left, and (5) the failure to guard the wire, may be considered together.

If it be conceded that the defendant company was negligent in each of these particulars, the dangerous condition resulting from such negligence was permanent and was perfectly open and obvious to a miner of any experience. Jewell Cruise knew, or ought to have known, all about the very conditions for which his administrator now seeks to hold the defendant company liable.   It would be difficult to conceive of a case in which a miner could have a better

opportunity than he had to become familiar with the conditions and the dangers surrounding him. Whether these were dangers ordinarily and necessarily incident to his work and not due to the negligence of the company, or the contrary, they were undeniably such as he knew or had every means of knowing before he was hurt. He was employed in the mine through the agency of his brother, Peter Cruise, whose testimony shows that he knew all about the mine and the methods of work there. Peter Cruise boarded with Jewell Cruise after the latter came there to work. J. M. Cruise, a first cousin of Jewell Cruise, though not at work when the accident happened, had driven, or had directed the driving of the air course right along where the accident happened. It has already been observed that Charlie Williams, his uncle, was at work in room 7, and that Bert Cruise, a cousin, was the brakeman whose duty it was to scotch the cars. These men were brought in frequent and close association with each other. They worked there together, necessarily conscious of the conditions complained of in this action, without a protest from any of them. Jewell Cruise was familiar with both the air course and the main entry, with the location of the wire and with the fact that the wire was not guarded. He was frequently in room 7 and passed the scene of the accident often. He had been using the air course as a walk way for several days just previous to and on the day of the accident, and if the rib was dangerously near the track he could not have failed to discover that fact.

We are of opinion, therefore that the case is clearly with the plaintiff in error upon the doctrine of assumed risk, even if all that the defendant in error claims be true as to the negligence of the company.

"Where all the conditions exist essential to support the defense of risk of the master's default having been assumed by the servant, viz., knowledge of the defect in

ways or place of work, or number and competency of employees, or in appliances or machinery, or rules or manner in which the business is conducted, and knowledge or comprehension of the danger and its voluntary acceptance by continuance in the service, such defense can only be overcome by evidence showing that the servant complained thereof to his proper superior, that the complaint was made for his own protection, that the master or his proper representative promised to remedy it, and that the servant's continuance in the service was due to his reliance on the fulfilment of such promise, and that the time which had elapsed between the making of the promise and the happening of the injury was not unreasonable therefor." 1 Shear. & Red. on Neg. (6th ed.), sec. 214-a.

Whether an employee has assumed the risk of dangers incident to his employment may be and often is a question for the jury, but not where, as here, the alleged causes of the dangers are so open and obvious and the knowledge or opportunity for knowledge on the part of the employee so complete as to leave no doubt that he knew or ought to have known all about them. In such a case the assumption of the risk as a question of law bars the recovery and is not a question for the jury. 26 Cyc. 1481-2, and cases cited in note 78.

There is another view of the case, however, which is also conclusive against the defendant in error. If we concede that the proximity of the right wall of the air course near the mouth of room 7 might have been unknown to Cruise, and that this condition was due to the negligence of the defendant, this negligence is not shown to have been the proximate cause of the injury. To see that this is true, it is only necessary to recur to the plaintiff's own theory as to how the accident actually happened. As shown above the claim is that the decedent was thrown "against the trolley-wire and carried down near the mouth of No.

5," etc. There is no claim now made, and no evidence to support any claim, that he was caught and rolled between the car and the rib. The case stated in the declaration utterly fails at this point. His cap and part of his lamp were found in the partly loaded car which struck him. His lamp was burning brightly when he entered the mine, but only a few moments theretofore he had been having trouble with it and had been cautioned by a fellow workman against risking it. The roof was low and he had to stoop as he walked. The plaintiff's proof shows that the motor was probably at work in the near by entry, making too much noise for the decedent to hear the cars coming out of No. 7. The men usually walked in the center of the track. The cars with no lights on them slipped out from the room on the right of the air course and struck him about the point of the switch. His body was found under the cars, not on the right but on the left rail of the track. Under these circumstances it cannot be said from the evidence that it is any less probable—indeed, it seems more probable—than otherwise, that he was struck by the cars before he realized their approach. This seems to be the opinion of Allen Cruise, his relative and friend, who looked over the situation immediately after the accident, and who is the only witness who ventures any definite theory as to just how the accident happened. If this is the correct theory, then the conditions in the air course had nothing whatever to do with the accident, since Cruise would, in that event, have been killed if the ribs had been entirely clear of the cars on both sides and if the wire had been completely guarded. And since this theory is at least as probable as any other one consistent with the physical evidence surrounding his death, there can be no recovery. *C. & O. Ry. Co.* v. *Sparrow,* 98 Va. 630, 641, 37 S. E. 302; *Consumers Brewing Co.* v. *Doyle,* 102 Va. 399, 402, 46 S.

E. 390; *C. & O. Ry. Co.* v. *Heath,* 103 Va. 64, 67, 48 S. E. 508.

The fact that the cars escaped from room 7 can, in no view, aid the plaintiff's cause. If their escape was due to unsafe rules and methods, and to lack of brakes on the cars, these were not, as we have seen, causes of which Cruise could complain. If the cars were insufficiently scotched, or if the scotch was removed, the fault was that of a fellow servant.

Once again, conceding that Cruise was ignorant of the conditions in the air course, and that this fact did contribute to his death, the defendant company cannot be held liable because it was not bound to foresee and provide against the unusual and improbable thing that occurred. The usual thing, the use of the air course as a haul-way operated by a motor and cars, with a motorman and brakeman carrying lights and keeping the cars under control, was going on all the time, and the evidence leaves no room to believe that Cruise would have been injured at all, or have been in any unusual danger if he had met a regular trip of cars at the point where he encountered those that ran away. It is the probable and not the improbable danger which the employer must foresee. *Va. I. C. & C. Co.* v. *Kiser,* 105 Va. 695, 705, 54 S. E. 889; *Persinger* v. *Alleghany, &c. Co.,* 102 Va. 350, 355, 46 S. E. 325.

We are clearly of opinion that there can be no recovery upon any view of the evidence, and this conclusion renders it unnecessary to consider the other assignments of error.

The judgment complained of will be reversed, and this court will enter the judgment which the circuit court should have entered.

*Reversed.*