### Staunton.

## RIDDLEY v. CLINCHFIELD COAL CORPORATION.

### September 11, 1916.

1. MASTER AND SERVANT—*Injury of Servant—Incompetent Fellow-Servant—Notice—Remaining in Service—Assumption of Risk—Question for Jury—Case at Bar.*—Whether or not the plaintiff in the case at bar assumed the risk of the negligence of a fellow-servant by remaining in the service after knowledge of his incompetency was a question of fact to be determined by the jury under proper instructions from the court, rather than one of law to be determined by the court. He knew of the incompetency of the fellow-servant and communicated that fact to the master, who immediately promised and undertook to remedy the evil complained of. In the situation in which the parties were placed it was necessary that the risk should be assumed by one or the other. The plaintiff expressly refused to do so, and the defendant equally expressly agreed to assume the responsibility, and very shortly thereafter the plaintiff was injured by the negligence of such fellow-servant.

    *Held:* The doctrine of assumption of risk *cannot* be applied as a matter of law to such a statement of facts.

2. DEMURRER TO EVIDENCE—*Different Conclusions from Evidence.*—On a demurrer to the evidence, where the evidence is such that the minds of reasonable men might differ as to the conclusion to be drawn therefrom, the court must decide in favor of the demurree.

Error to a judgment of the Circuit Court of Russell county in an action of trespass on the case. Judgment for the defendant. Plaintiff assigns error.

*Reversed.*

The opinion states the case.

*Wm. H. Werth* and *W. M. Long,* for the plaintiff in error.

*Burns & Kelly, E. M. Fulton* and *Morison, Morison & Robertson,* for the defendant in error.

Sims, J., delivered the opinion of the court.

In this action to recover damages for personal injuries to appellant, there was a demurrer to the evidence by the appellee, defendant in the court below, a verdict of the jury, subject thereto, in favor of the appellant, plaintiff in the court below, which demurrer was sustained by the court and judgment was entered by the latter for the defendant. This action of the trial court is assigned here as error.

Plaintiff was an employee of the defendant, mining and loading coal in defendant's mine No. 5, by contract. After the coal was loaded in cars in the mine, it was the duty of the defendant to haul the cars out of the mine to the tipple, and it was also the duty of defendant to place empty cars in place to be loaded by plaintiff. The motorman operating the electric locomotive—called a motor—and a brakeman engaged in handling such empty and loaded cars, were employed and paid by the defendant. There were eight rooms in which coal was being mined by plaintiff at the time of the accident, numbered 1, 2, 3, 4, 5, 6, 7 and 8, 50 feet from one room neck to another, on the right hand side of the entry going into the mine past these rooms. This entry had been driven about 35 feet beyond the last room, No. 8. Along this entry there was a track which extended to within about 12 feet of the face of the coal in the "heading," or end of this entry, and tracks switched off to the right, as the mine was entered, from this entry track, at the neck or entrance of, and passed into each of said rooms. The current of electricity moving the motor reached it by means

of a trolley pole, extending above the motor, similar to such pole of a street car such pole having a wheel on the end of it running along in contact with a trolley wire suspended over all of said tracks, except that the trolley wire hung over said entry track "ended at No. 7 room" (p. 67 record), and in order for the motor to go into room 8, or beyond the entrance to room 7, it was, according to the testimony of the plaintiff, "supposed to stop, take the hook off the reel and hang it on the trolley wire and go to No. 8," or beyond No. 8 on the track extending near the "heading" . . "he (the motorman) was supposed to stop at No. 7, if he was going ahead, and hang the cable—this cable pulled out as he run . ." (pp. 67-68 record).

The accident happened during work in the mine on a night shift between 3 and 4 o'clock. The plaintiff testified, on what we conceive to be the turning point of this case, as follows:

Q. Who was the motorman at the time you were injured?

A. Hugh Stacy.

Q. Was he white or colored?

A. Colored.

Q. How long had you been working in No. 5 mine at the time you were injured?

A. Nearly four months.

Q. How long had Hugh Stacy, the motorman, been working in No. 5 mine at the time of the injury?

A. I guess a couple of months.

Q. I will ask you to go ahead and state to the court and jury, in your own way, how this injury happened, and the facts and circumstances leading up to it?

A. Well, we went out that night to work—You mean commencing that night?

Q. That night, yes.

A. Well, the evening before I went up that night, I asked Mr. Rutters—had asked him three or four times—about putting on another motorman, and he promised he would. Asked me who I wanted and I told him Mr. Hurst—before that he told me he would put Mr. Hurst on the motor—he told me to put Mr. Hurst on the motor and I done so and went down under the hill after the cars, and got down at the bottom the night foreman was there, He says, "What are you doing with another motorman on," and I says, "Mr. Rutters told me to put Mr. Hurst on the motor," and he says, "Hugh, will you brake for him?" and he says, "No, I will quit . . ."

Objected to.

The Court:

Was that the bank boss?

Mr Worth:

Yes, sir.

Objection overruled. Exception by defendant.

A. (Cont'd) Well, he took Mr. Hurst off the motor then and put Hugh back on—

Q. Who was Rutters?

A. He is bank boss.

Q. Who was Hanks?

A. He was night foreman.

Q. Rutters was day bank boss and Hanks was night bank boss?

A. Yes; Hanks saw to the cutting of the coal.

Q. Go ahead.

A. He put Hugh back on the motor and could not get anybody to brake for him. He asked me if I would brake for him and I told him I did not want to brake for Hugh, and he wanted to know why, and I told him he run too fast and I had not broke to say

any at all, and was afraid I might get caught with the motor. He got Hugh back in the motor and said it would be all right. I went back up to see Will Andrews to see if he would brake—

Objected to.

Q. Did Will Andrews brake any that night?

A. Yes, broke about an hour.

Q. Did he quit?

A. Yes, sir.

Q. Who took his place?

A. George McQueen.

Q. How long did he brake?

A. Very near to twelve o'clock.

Q. Did he quit?

A. Yes, sir.

Q. Who took his place?

A. I did, until I got hurt.

Q. Did you have any conversation with Walter Hanks, the night bank boss, about braking?

A. Yes, sir.

Q. Go ahead and tell what he said.

A. Well, George McQueen come off braking, and I got on the motor and went to the outside to see if they could put another brakeman on there. He said he didn't have another brakeman, and "I will have to shut down tonight, can't get nobody to brake unless you will brake."

Q. What did you say?

A. I told him I would not brake.

Q. Why?

A. Because I was afraid he might hurt me; he ran too fast.

Q. What else was said at the time by Hanks?

A. He says, "I will have Hugh run slow if you will brake." He looked up and says, "Hugh, you will run

slow, so there will be no danger?" and he said he would. I went on on them terms and took up some cars and brought loads outside, and went back and had one extra took out beyond No. 8 and placed an empty in there and come back for the empties, got six more empties and went back to the top of the hill—men had all come out below down there to get some cars, all on the outside but a couple of loaders—we started back to pick up one out of No. 7 and then back down to No. 8 and on the way he started to speed and further he went the faster he got and the light on my cap blowed back, wouldn't give no light in front at all. When it passed No. 7 room I could not tell what it was, running so fast, run into this load and knocked it around into the heading and mashed my foot plumb flat.

Q. I will ask you to take off your shoe and sock and show your foot to the jury?

(Witness done so. Note: Right foot on the inside.)

Q. Have you the same use of that foot now as you did before the injury?

A. No, sir.

Q. You said something about speaking to the day bank boss, Reece Rutter, about Hugh Stacy, the motorman. I will ask you to tell the jury how many times you spoke to the day bank boss and night bank boss about the kind of motorman Stacy was.

A. I went to Mr. Hanks the evening before the evening I got hurt and he said he had no right to change the motorman.

Q. You went to Mr. Hanks and he said he had no right to change the motorman?

A. Yes, sir.

Q. Did he direct you to see anyone else?

A. He said Mr. Rutters was the one who hired him.

Q. What did you tell Hanks?

A. I told him I had a man I could put on the motor.

Q. Why did you want to put a man on the motor?

A. So that I could keep a brakeman and have more success getting out coal.

Q. Why were you not able to keep brakemen?

A. They were all afraid to brake for him the way he run, such reckless speed.

Q. What did you tell Hanks about the motorman at the time you asked for another man?

A. I told him I could not keep brakemen.

Q. Did you tell him why you could not keep brakemen?

A. Yes, sir.

Q. What?

A. They were all afraid to brake under him.

Q. Why were they afraid to brake under him?

A. He was reckless, would not wait for a signal—just run the motor right on.

Q. Did you mention anything to Hanks about his fast running and speed?

A. I told him I could not keep brakemen.

Q. Did you say anything about his speed?

A. Yes, I told him he run so fast the brakemen were afraid to brake for him.

Q. Did you tell Reece Rutter about the way Stacy was running?

A. Yes, sir.

Q. Tell the jury what you told him?

A. I told him I wanted another motorman and he wanted to know what I wanted another motorman for, wasn't Stacy doing all right, and I told him Stacy could not keep brakemen, he run so fast they were all afraid of him.

Q. State whether you told him he was running fast?

A. Yes, sir.

Objected to.

The court: Have him state all he said about it—just what was said.

A. (Cont'd) I told Mr. Rutters I wanted another motorman and he asked what was the matter with Stacy, wasn't he doing all right, and I told him no, the way he run could not keep brakemen, run the motor so fast they would not brake for him.

Q. How many brakemen quit Stacy?

A. In the run of the two months?

Q. Yes.

A. I would not be able to say.

Q. Give your best idea?

A. I would guess, if I was making an estimation of it, 10 or 12 brakemen.

Q. Why did they quit, if you know?

A. I don't know why they all quit.

Q. Why did the ones quit that you know about?

A. Didn't want to get hurt.

Q. Do you know the general reputation of Hugh Stacy among the miners and other employees there for reckless running?

Objected to.

The Court: You may ask him if he had a reputation first.

Q. State whether or not Hugh Stacy, the motorman, had a reputation among the miners and other employees of the Clinchfield Coal Corporation for reckless running and speeding?

Objected to, because leading.

Q. State whether Hugh Stacy, this motorman, had a reputation among the employees there at Dante as motorman?

A. They called him "the wild motorman."

Q. They called him the wild motorman?

A. Yes, sir.

Q. What do you mean by they?

A. Well, that was—

Q. Who called him the wild motorman?

A. The loaders and other motormen.

Q. Did you ever hear the brakemen speak of him?

A. No, sir; I don't know that I could say more than that I have told you about his reckless running.

Q. At the time of this injury, did the motor have any lights on it?

A. No, sir.

. . . . . . . . . . . .

Q. State whether or not you and the motorman had any lights on your caps at the time of the injury?

A. Yes, sir.

Q. Would these cap lights give any light when the motor was running at an excessive rate of speed?

A. Yes, sir.

Q. Hou much?

A. You could see 15 or 20 feet ahead all right.

Q. How far could you ordinarily see when you were not running at such a rapid speed?

A. See from one room neck to another, 50 feet.

Q. What effect, if any, did the speed have on the light from your caps?

A. Made a suppression in the air, turned the light back against the lamp and cap.

. . . . . . . . . . . .

Cross-examination.

. . . . . . . . . . . .

Q. The main line then was necessarily clear then before that?

A.   Until we left the car there—That was as far as the entry went; that was the end of the entry.

Q.   Who was acting as brakeman when the car was set out there?

A.   I was.

Q.   You were?

A.   Yes, sir.

Q.   Who uncoupled the car?

A.   I did.

Q.   Then you left the car on the main line?

A.   Yes. sir.

Q.   How long before this accident occurred did you leave the car on the main line?

A.   It had been, I expect, thirty minutes.

Q.   You knew the car was on the main line?

A.   Yes, sir.

Q.   What was the motorman doing at the time this motor ran into the car?

A.   He was running the motor.

Q.   Did you see what he was doing?

A.   I was on the front end of the motor and he was on the hind end.

Q.   Could you see what he was doing?

A.   I could see the top of his head—could not see what he was doing.

Q.   Did you look back?

A.   I could see his head; could not see where the controller was.

Q.   Did you look back at him?

A.   No, sir.

Q.   You were looking straight ahead?

A.   I was trying to.

Q.   How is that?

A.   I was trying to.

Q. Was there anything to prevent you from looking ahead?

A. No, sir.

Q. Had your foot hanging down over the bumper?

A. I was sitting up on the bumper. Have a place on the bumper where they couple and a place higher up where the link goes in.

Q. Your foot was struck by the bumper and the other car?

A. Yes, sir.

•  •  •  •  •  •  •  •  •  •

Re-examination.

•  •  •  •  •  •  •  •  •

Q. You stated that you bunched the cars and when you got a load you carried it out. Where did you carry it?

A. Got it from the room and set them on the entry until we got a trip made up, would get the first room and set them back and pull up and get another, and get a trip made up and carry them out to the outside.

Q. Where was the trip made up to be carried to?

A. From eight room to No. 1.

Q. You say until you got a trip made up—Where did you intend to carry the trip after you got it made up?

A. Outside to the side track.

Q. What track?

A. Side track; back switch, you might call it.

•  •  •  •  •  •  •  •  •

Q. Well, go ahead and tell the court how much experience you have had as motorman or brakeman, either one?

46

A.   I have been around where motors have been run for the most of my work in the mines; I have broke a little off and on and run a little bit and placed machines.   So far as working regular on a motor, I never worked regular on a motor.

Q.   How long have you worked in mines where they operated motors?

A.   Well, off and on ever since I have been mining, about eight years.

Q.   To what extent did you ever work as brakeman or motorman?

A.   Just a shift now and then.

Q.   Occasionally?

A.   Occasionally—Whenever it come down had nobody else, I just broke for the accommodation of the work.

Q.   Now, I will ask you again, do you know, and if you don't know, you will say so, where the usual and customary place is for brakemen to ride when they are braking on motor trips in mines?

A.   Yes, sir.

Q.   I will ask you to tell the jury where that usual and customary place is, on which end of the motor with reference to the place that you were riding on the night that you were injured?

A.   When you are going ahead, the usual place is for him to ride at the front end of the motor.

Q.   On the front end.   Where were you riding that night?

A.   On the front end of the motor.

Q.   Tell the jury what, if any, difference there was between the position you occupied that night and the position usually occupied by brakemen riding on motors when they were doing the same kind of work you were doing that night—Was there any difference in your position and theirs?

A.  There was not.

Q.  You say you placed that car in that heading yourself?

A.  Yes, sir.

Q.  When the motorman started back on the run or trip in which you were hurt, where did he intend to go or where did you and he intend to get the cars, to go on that trip?

A.  Heading to No. 7 room.

Q.  How far was No. 7 room from the car you had left standing in the heading?

A.  About 65 feet.

Q.  Tell the jury if you knew when the trip which you were hurt on passed No. 7 room and if you didn't know when it passed there, why you didn't know it?

A.  Well, I didn't know when it passed the room because he run so fast I could not count the rooms as he passed them.

Q.  Why didn't you get out of the way of the stationary car in the heading before he hit that and it hit your foot?

A.  I thought he would stop when he run up to No. 7 room.  I was looking for him to stop.

Q.  If I understand you, you mean to say that you did not know you had passed No. 7 room?

A.  No, sir; I did not know it.

Cross-examination.

.    .    .    .    .    .    .    .

Q.  Did you say you were hired that night to work as brakeman?

A.  Hired?

Q.  Yes, were you hired?

A.  Yes, sir.

.    .    .    .    .    .    .

Q. You didn't occupy that position because it was usual and customary?

A. What do you mean by that?

Q. What I mean to ask you is if you used your own knowledge as to the place to occupy, or did you ask somebody?

A. I knew where the brakemen—If you would see a wagon drive for eight years, would get in the seat to ride or stand on the wheel? You would know, wouldn't you?

Q. That was the reason you took that position?

A. Yes, sir; that was where the other brakemen all rode.

Q. You didn't have any direction to get up there that night, did you?

A. That is where they rode.

Q. You have said that several times. I would like for you to answer my question. I asked you if you took that position on the motor that you did take that night because it was usual and customary?

Mr. Werth: He said he did a dozen times.

Mr. Robertson: Let him say it again.

A. That is what I done. He told me to go on and brake and I went as brakeman.

Q. So you used your own judgment because it was usual and customary? Answer yes or no.

A. I rode the front end of the motor, yes.

Mr. Werth: There is nothing alleged in the declaration and nothing said by counsel that he was told to get there. We don't claim that Hanks told him to get there.

A. The boss never told me where to get.

.   .   .   .   .   .   .   .   .

Q. You didn't pay much attention to where you were going?

A.   He was supposed to stop; he run by a nip with juice on it, was not supposed to run on past it.

Q.   Was he supposed to know any better than you where to stop?

A.   He was running the motor.

Q.   If you had wanted to have gone in No. 6 room, how would you have notified the motorman?

A.   He would have stopped before he got to the switch at No. 6.

Q.   Suppose he did not know it?

A.   He was running the motor, he ought to know. He told me where he was going to pick up the cars.

Q.   He picked them up where you told him to?

A.   He told me where he was going to.   The brakeman does what the motorman tells him to, he was the motorman.

.   .   .   .   .   .   .   .   .

By Mr. Werth:

.   .   .   .   .   .   .   .   .

Q.   You were asked something about volunteering as brakeman that night?   Have you got a ticket showing that the company paid you for that night's work as brakeman?

A.   Yes, sir.

Q.   And they issued you a ticket and paid you that night as a brakeman?

A.   Yes, sir.

There was some testimony of other witnesses for plaintiff corroborative of his tesstimony and a good deal of testimony for defendant in conflict with plaintiff's testimony, especially as to the competency of the motorman, Stacy; the defendant's exercise of reasonable care to ascertain his competency; its reasonable

belief in his competency and denial of any notice from plaintiff or otherwise of the motorman's carelessness or recklessness; as to customary place for brakeman to ride; and other contradictory testimony; and Hanks testified for defendant as follows:

A. And when I found Mr. Riddley at the drift mouth or mouth of the mine, I asked him how the accident occurred and he told me he left a car on the haulway or on the entry that he failed to couple on the other trip and that they run into it, and he had cut his feet off. I believe he told me, if I am not mistaken.

Q. So that this accident happened by Riddley's running into a car that was on the track?

.   .   .   .   .   .   .   .   .

A. I don't remember all he said.

Q. I understand you to say he told you that he had left the car on the track?

A. Yes, sir; on the other trip.

Q. I want to ask you if it's proper and customary for brakemen to leave a car on a track in a place of that kind in the mine?

.   .   .   .   .   .   .   .   .

A. I could not say exactly what was the rule there at that mine. Part of the time we would haul them from the mines to a yard and part of the time put them on a back switch. It is the usual rule—

Mr. Werth: I understood you to say that you did not know at that time?

A. (Cont'd) We hauled the coal out of the mine, out of No. 5, and would back switch what it would hold; put it on the back switch and what it would not hold we took it to the yard—that is, when we got the trip. Of course they had places to make up trips.

Q.   What is the general custom and rule as to brakemen leaving loaded cars on the track?

Objected to.   Objection overruled.   Exception by plaintiff.

A.   Well, the usual, customary and general rule is—

.   .   .   .   .   .   .   .   .   .

The Court: I don't think it necessary to go into what the general rule is.   Plaintiff says he put that car there himself.

Mr. Fulton: We are trying to show that it was not proper to put that car there and leave it there, and to show that there was no rule or custom to put it there.

The Court:   Q. Mr. Hanks, do you know what the general custom was at No. 5 mine as to brakemen leaving loaded cars on the track there?

Objected to.   Objection overruled.   Exception by plaintiff.

A.   Well, the rule applied to all the five openings on that side, though I had it all.

Q.   And No. 5 was one of them?

A.   Yes, sir.

Q.   What was that general rule and custom?

Mr. Werth: We object.   He said they had a rule of that sort.

Mr. Robertson:   We have printed rules for the government of the mine and this rule is not inconsistent to our printed rules.

The Court:   If you show a rule in No. 5 and that the plaintiff had knowledge of it, that would obviate the necessity of having printed rules or showing the printed rules.   If you show it was a rule and he knew it was the rule, notwithstanding they might not have printed or published it, you may do that, because the purpose of the publication is to let the parties know what the rule is.

.   .   .   .   .   .   .   .   .   .

Cross-examination.

.  ·.  .  .  .  .  .  .  .

Q. Was there among the printed rules any rule telling how trips should be made up?

A. I don't remember.

Q. If there was any, do you know anything about it? Did you ever read any such rule?

A. I could not say at present time.

Q. If you did you don't remember about it?

A. I don't remember exactly what I did read about it. They had the printed rules up there, but I don't remember what I read.

Q. Was there any particular custom with reference to how the trips should be made up when the trips consisted of the cars coming out of the eight rooms that Mr. Riddley was working in?

A. I don't know that they had any regular system in making up trips.

Q. That is what I am asking you about?

A. Sometimes haul three cars and sometimes five.

Q. Yes. What did you mean when you said in chief that there was a rule about making up trips not to leave cars on the track and go back and get another car, etc., like the motorman did in this case?

A. I don't understand what you mean.

Q. Didn't you say to Mr. Robertson that there was a rule of that kind or a custom of that kind?

Mr. Burns: He did not say anything about that.

Mr. Werth: Hasn't he got sense enough to say so if he didn't, without answering for him?

Q. What did you say on that subject? I understood you to say, and if I misunderstood you I want you to correct me—I understood you to say it was against the rule to bring a car out and stand it on the

main line and go after another, it was against the cus-tom to do it.    You didn't say that, or did you say it?

A.    I don't understand your question yet.

Q.    You don't?

A.    No, sir; I don't.    Make it plainer.

Q.    If I understand you, now, you admit to the jury that there is no rule which forbids the motorman to make up a trip, go and get cars out of a room and stand them on the track and go and get another car?

A.    You mean printed rule?

Q.    Of course; or the rule and custom—I want to get at the same thing you got at when you were testify-ing in chief for these gentlemen over here.

A.    It was against orders to set cars on the main line in making up trips, unless they left a flag up.

Q.    What did you mean when you said there was no system about it in this mine where this man was. working?

A.    Had the same system in making up trips, but in bringing them to the outside didn't have any system.

Q.    What did those orders you referred to say?

A.    I could not say.    It has been 12 months since I saw and read it.    I suppose they have got them.

Q.    You testified about that awhile ago?

A.    If I understood the question, I testified awhile ago, only asked me what the rules and regulations were with the foreman.

Q.    The foremen did not make up the trips, did they?

A.    They gave orders, didn't they?

Q.    What did you understand them to refer to, did they have reference to these eight rooms that Mr. Riddley was working in, or not?

A.    I had reference to No. 3 mine.

Q. This is No. 5 mine?

A. Supposed to have been worked under the same rules.

Q. Did this man, Hugh Stacy, violate any rule when he set the car back on the main track and went after another; did he violate any rule or custom or order?

A. I suppose it was the brakeman's duty; he should have coupled the car.

Q. I am not asking you what you suppose. What order, rule or custom was violated when they set the car back on the track and went after another car?

A. It was the duty of the brakeman to couple it.

Q. Read the question.

A. I don't know that he went after another car at that time. I don't know that he went after another car.

Q. Read the question again.

A. I answered that question, didn't I?

Q. If you had and given an answer I understood, I would not have asked it again. If you have answered it, I will ask you to answer it again.

A. I don't know that Hugh Stacy went after another car when he set it back there.

Q. You made that answer awhile ago. The lawyers, jury and everybody else heard you say you were not there, and know that you don't know what they done, and I am not asking you what they done that night. I am asking you what rule, custom or order —catch this now—did Hugh Stacy or Henry Riddley violate when they set that car on the main line and left it there and went back after another car?

Objected to. No evidence here they went back after another car.

The Court: Ask him what rule was violated when they set the car on the track there.

Mr. Werth: Assuming that they did go back after another car.

Mr. Burns: The evidence is they took the trip and went on.

Q. Read the question.

A. I don't know that they went back after another car.

Q. Mr. Hanks, it don't seem to me to be possible for you to misunderstand that question. I am not asking you what these men did or did not do. Assuming that they did go back after another car.

A. I don't know.

Q. In answering that question, you assume that they did this will you? You did that when you testified for them. Assume that they left the car on the main line and went back to get another car. Now, if they did that, what rule, custom or order, did they violate when they did it?

A. It was against orders.

Q. What orders?

A. Orders of the foreman.

Q. Was it against the printed rule of the company?

A. I can't say. I don't remember exactly the words of the printed rules, because it has been quite awhile since I read them.

Q. Now, was it against the custom that they usually observed in that mine when they were making up trips, was it against the usual and customary way they usually did it?

A. I could not say as to that.

Q. You spoke of orders, what orders did they violate?

A. Orders of the foreman.

Q. What foreman?

A. Me for one.

Q. Who did you give orders to?

A. I gave Stacy those instructions. If I am not mistaken I told Mr. Riddley when he was breaking for me before.

Q. Are you mistaken or not?

A. I am pretty well satisfied that he has heard me instruct the brakemen to that effect.

Q. Everything you said in your examination in chief was based on what you said to Stacy, everything on that subject. Have no recollection of giving orders of that kind to anybody else?

A. Not Mr. Riddley.

. . . . . . . . .

Q. So far as you know, you never at any time give him any special orders?

A. Not Mr. Riddley.

Q. So far as you know, he had no knowledge that it was improper to leave a car on the main line?

A. I could not say about that.

Q. There was nothing in the rule about it, nothing in the custom about it, and so there was nothing except your special orders, and you never gave him any special orders?

A. Not at that time.

Q. Did you at any time?

A. Not to my recollection.

. . . . . . . . .

Q. . . How many cars did this motor pull out of there generally, and carry to the outside?

A. On an average?

Q. Pull out of this mine, Riddley's working place —how many cars take at a trip to the outside?

A. They would take from five to eight or twelve sometimes.

Q. Took as high as twelve loaded cars at one trip?

A. Yes, sir.

Q. How many would it bring in there?

A. Sometimes take in five or six or seven.

Q. They got all of these cars out of the rooms, didn't they?

A. Supposed to get them out of the working places.

Q. How far had the rooms been driven back from the entry?

A. Different distances. Some 50 feet, some 60 feet and some not so far, and some maybe further.

Q. In order to carry as high as 12 cars to the outside from the working places, they all had to be brought out, some from one room and some from other rooms?

A. Yes, sir.

Q. Where would they leave the cars?

A. Sometimes make a trip down in the room.

Q. Wouldn't get 12 cars out of one room?

A. No; take the car out and go on to another and back the trip in there.

Q. Go into a room and get the first car, then where would they pull it to?

A. To the haulway.

Q. Where would they leave it standing, on the ground or on the track?

A. Leave it on the track.

Q. Main track?

A. They seemed to have had that one on the main track.

Q. I am talking about the usual way of making up trips?

A. Hold on to the car.

Q. If they held to the car, how could they put an empty back up in that room?

A.   They could switch the loaded car and shift the empty down into the place.

Q.   What would they do with that loaded car when they went to get a car out of another room?

A.   Back up into the room or back up into the heading and hook on.

Q:   When they got the cars out of two rooms, how would they get the car out of the third room?

A.   Couple it to the trip.

Q.   If they had got 11 cars out of the rooms and was going to get one other, would they haul the 11 cars into one room in order to get the car out of it?

A.   No, sir.

Q.   What would they do with them?

A.   Back them up in the room or back them up in the heading.

Q.   If they done it that way, they would push all them loaded cars over the switch, around the curve and into the room in order to get one loaded car out of another room?

A.   Why, sure they would do that.

Q.   If I understand you, then in gathering a trip of cars they would push that trip back and forth, in and out of the rooms, the whole trip, into each room?

A.   That is what I told you.

Q.   What was usual and customary way of doing that, if they had loaded cars in these rooms and wanted to gather them to take to the outside?

A.   I think I thoroughly answered.

Q.   When they went in the room to get a loaded car, would they keep the other loaded cars to the motor?

A.   No, sir.

Q.   What would they do with them?

A.   Put them into some room—

Q. Suppose got cars out 5, 6 and 7, each one contains loaded cars, and they wanted to gather the cars out of these rooms for the purpose of making up a trip to carry to the outside, just tell the jury in detail how they done that?

A. They could—

Q. I never asked you how they could do it.

A. I could not tell you how they done it at that time.

Q. Under the orders that you gave to him, how they ought to done it?

A. Supposed to get them and back them up in one room as a side track.

Q. I say, suppose they have loaded cars in rooms, 5, 6 and 7, and suppose they wanted to gather them cars together in order to make a trip to haul to the outside, tell the jury how the cars ought to be gathered for that trip?

A. According to my instructions, they would use No. 1 room, or some room, for a side track, pull the loads out and back them into that room for a side track, and then hook to them and pull them out.

Q. Do you mean run in No. 5 room and get the cars and bring them into room No. 1 and then into another room and back it up in No. 1 and let it stand? Is that the way you told them to make up the trips?

A. That is according to my instructions. I told you awhile ago I didn't remember giving Riddley any instructions at all.

Q. Didn't you say awhile ago, get the loaded cars and back them up against the main heading or take them to the room?

A. I said could do that.

Q. If they took one loaded car out of there and backed up against the main heading, they would been according to your instructions?

A. I told you I didn't give Riddley any instructions at all.

There was some testimony for defendant to the effect that plaintiff, when acting in the position of brakeman, should have ridden on top of the motor. There was testimony for plaintiff tending to show that the roof of the entry in question was too low to permit that. There was also some testimony for defendant to the effect that plaintiff should have ridden on the stirrup or step of the motor or on the rear end on the motorman's deck with the motorman. On these points the plaintiff testified as follows:

Q. Did the motor that you were hurt on on the night in question have a stirrup on it or not?

A. It didn't have any stirrup on it.

Q. Mr. Hanks, I believe, said something about the brakeman riding on the motorman's deck. I will ask you to describe to the jury what a motorman's deck on a motor is, what it consists of, how big it is?

A. It has about two feet space inside, and about a foot of the space is took up by the controller box on the right hand side and he sets to the left.

Q. It has a seat made there for the motorman?

A. Yes, sir.

Q. On the left of the controller?

A. Yes, sir.

Q. Is there any place for anybody to ride on the motorman's end of the motor except the motorman?

A. No, sir.

The testimony of plaintiff also showed that as contractor he had the authority to direct the motorman what loaded cars to take out of the different rooms above mentioned and what empty cars to place therein, but he had no authority over the motorman with

respect to directing the manner in which this work should be done.

The above summary and quotations from the testimony sufficiently show the questions of law which arise therefrom for the decision of this court, the case being considered under the rule applicable to a demurrer to evidence.

When considered under the rule just referred to, we must conclude that the jury would have been warranted by the evidence in finding—

1. That the motorman, Stacy, was incompetent, because of his habitual negligence in reckless running, and that the plaintiff complained of this a number of times, and made it known to the defendant, before and also on the night of the accident, a few hours before the accident.

2. That this incompetency was as well known to plaintiff before the accident as it was to the defendant.

3. That a few hours before the accident, at the time of the employment by defendant of the plaintiff as brakeman, defendant said to plaintiff, "I will have Hugh" (the motorman in question) "run slow if you will brake," and said to the motorman, "Hugh, you will run slow so there will be no danger?" and the motorman said he would; and that the plaintiff accepted the employment of brakeman "on them terms."

4. That the proximate cause of the accident was the incompetency of said motorman, resulting in his running too fast and at a reckless rate of speed at the time of the accident.

The question of law arising from this state of facts which might have been found to exist by the jury is this:

(a) Did plaintiff, in this situation, assume the risk of the incompetency of his fellow servant, the motorman?

47

In *Va. I. C. & C. Co.* v. *Stanberry*, 117 Va. at p. 859, 86 S. E. 131, this court said: "The question is this: Where a master knowingly employs an incompetent servant, or keeps him in service after such knowledge, does the doctrine of assumption of risk apply to a plaintiff (a fellow servant) whom the evidence tends to show also knew of such incompetancy, and bar a recovery for injuries resulting from the negligence of the incompetent servant?

"We are unwilling to apply that doctrine *as a matter of law* to the facts of this case. Without going into details of the evidence affecting the questions of assumption of risk and contributory negligence on the part of the plaintiff in remaining in the service of the company with such knowledge as he may have possessed of the motorman's incompetency, we have no hesitancy in holding that it involved a question of fact to be submitted to the jury on proper instructions, rather than one of law to be decided by this court."

Such being the ruling of this court in the *Stanberry Case*, we feel that *a fortiori* there must be the same ruling in the case at bar. In the *Stanberry Case* there was no complaint by the plaintiff to the defendant, or express notice given to the latter by the former, of the incompetency of the fellow servant, nor any action taken or promised by the defendant in the direction of remedying the abnormal conditions of danger theretofore existing or towards restoring normally safe conditions in this regard. In the case at bar, there was evidence before them from which the jury might have held that there was such complaint by the plaintiff to the defendant and express notice given to the latter by the former of the incompetency of the fellow servant, the motorman, and that promise was thereupon made by defendant at the time of the employment of the

plaintiff as brakeman, and action thereupon immediately taken by the defendant in the direction of remedying the abnormal conditions of danger complained of and towards restoring normally safe conditions in that regard.

Counsel for defendant, in brief for defendant, themselves say: "If a working place is not reasonably safe, and if the master has not exercised ordinary care to make it reasonably safe, he has failed in a non-assignable duty, but if the servant knows that the place is not reasonably safe, or in the exercise of ordinary care ought to have know it, and continues to work therein without protest on his part and a promise to repair on the master's part, he assumes the risk and cannot recover. *S. W. Imp. Co.* v. *Andrews*, 85 Va. 270 [9 S. E. 1015]; *Robinson* v. *Dininny*, 96 Va. 41, [30 S. E. 442]; *Russell Creek Coal Co.* v. *Wells*, 96 Va. 416, [31 S. E. 614]; *Parlett* v. *Dunn,* 102 Va. 459, [46 S. E. 467]; *V. I. C. Co.* v. *Asbury*, 117 Va. 683, [86 S. E. 148].

"The same rule applies to rules and regulations. *Parlett* v. *Dunn*, 102 Va. 459, [46 S. E. 467]; *So. Ry. Co.* v. *Foster*, 111 Va. 763, [69 S. E. 972]; *Moore Lime Co.* v. *Richardson*, 95 Va. 326, [28 S. E. 334, 64 Am. St. Rep. 785].

"The same rule applies to tools and instrumentalities. *R. & D. R. Co.* v. *Risdon's Admr.*, 87 Va. 335, [12 S. E. 786]; *N. & W. R. Co.* v. *McDonald's Admr.*, 88 Va. 362, [13 S. E. 706]; *White* v. *Newport News Shipbuilding & Dry Dock Co.*, 95 Va. 355, [28 S. E. 577].

"And by analogy as well as upon reason and principle, the same rule should apply to incompetency of a servant, if the fellow servant either knows or ought to know of such incompetency. *Young* v. *W. Va. & C. P. R. Co.*, 42 W. Va. 112, 24 S. E. 615.

"In *Clinchfield Coal Corporation* v. *Cruise*, 117 Va. 645, 652, 653, [86 S. E. 135, 137], it is said, at pages 652-3: 'Where all the conditions exist essential to support the defense of risk of the master's default having been assumed by the servant, viz., knowledge of the defect in ways or place of work, or number and incompetency of employees, or in appliances or machinery, or rules or manner in which the business is conducted, and knowledge or comprehension of the danger and its voluntary acceptance by continuance in the service, such defense can only be overcome by evidence showing that the servant complained thereof to his proper superior, that the complaint was made for his own protection, that the master or his proper representative promised to remedy it, and that the servant's continuance in the service was due to his reliance on the fulfilment of such promise, and that the time which had elapsed between the making of the promise and the happening of the injury was not unreasonable therefor.' 1 Shear. & Red. on Neg. (6th ed.) sec. 214-a.

"In *Frazier* v. *R. R. Co.*, 38 Pa. St. 104, 111, 80 Am. Dec. 469, it is held: 'But if the plaintiff knew that his conductor was habitually careless, and chose to continue in service with him, and did not inform the company of his known acts of carelessness and refuse to serve with him, he can have no claim against the company for injuries suffered from further carelessness, even if the company did also know.' "

The case at bar "in reason and principle" falls directly under this position of counsel for defendant and the authorities cited by them.

Mr. Labatt, in discussing this principle, in 4 Labatt's M. & S. (2nd ed.), sec. 1343, says: "In order to entitle the servant to recover, the master or his representative

must have said something which could reasonably be construed as a stipulation to prevent or to remedy the dangerous condition in question. But the mere fact that no formal promise was given is not sufficient to exclude the inference of an agreement by the master to furnish or restore normally safe conditions. Any acts or expressions by which the servant gives the proper agent of the employer to understand that he is unwilling to continue in the employment, unless the cause of the danger is removed, constitute a sufficient complaint; and any acts or expressions by which such agent gives the servant to understand that the cause of the danger will be removed, constitutes a sufficient promise."

We think that the testimony of plaintiff as to *the promise* of the defendant, through its representative, Hanks, to remedy "the dangerous conditions in question" and his statement, "I will have Hugh run slow if you will brake," and his injunction or request addressed to the motorman, "you will run slow so there will be no danger," amounted to the defendant's assuming the responsibility for the competency and reasonably careful conduct of the motorman in running while the plaintiff was braking, and relieved the plaintiff from the assumption of risk of the incompetency of such fellow servant, That is to say, the ordinary rule as to assumption of risk by the plaintiff was overcome in this case because his acceptance of employment as brakeman, "was due to his reliance on the fulfillment of such promise, and that the time which had elapsed between the making of the promise and the happening of the injury was not unreasonable therefor." 1 Shear. & Red. on Neg. (6th ed.), sec. 214-a, cited and quoted by counsel for defendant as above stated.

The effect of the promise did not go further than this: It did not make the defendant an insurer or guarantor that the motorman was competent or that he would not run negligently; it merely placed the plaintiff in a position in which he was justified in relying upon the expectation that the motorman, the fellow servant, would obey the injunction or request of the common master and would conduct himself in a reasonably competent and careful manner in his future running of the motor. In the situation which confronted them, either the plaintiff or the defendant had to assume this risk or take this responsibility, or the movement of cars in and output of coal from the mine No. 5 would cease. It was to the interest of both that it should continue. The plaintiff positively and expressly refused to assume the risk. The defendant expressly assumed the responsibility. The defendant need not have expressly done so. In that case, if plaintiff had gone on at work as brakeman with the motorman, under the rule applied in the *Stanberry Case*, the plaintiff would not, *as a matter of law*, have assumed the risk of the incompetency and negligence of the motorman, but that would have been a question of fact for the jury. Certainly the express assumption of such responsibility by the defendant did not put the plaintiff in a worse position than he would have been in if the defendant had kept silent.

There is but one other question that we need consider, and that is—

(b) Was the plaintiff, after he accepted the employment as brakeman, guilty of such contributory negligence as will bar his recovery?

Counsel for defendant very ably and forcefully contend that the position in which the plaintiff "sat there with his foot over the end of the motor" knowing

that he himself as brakeman had left a car on the main line of track near the heading which he was approaching, etc., his leaving such car there, etc., etc., were acts of contributory negligence *per se.* It will be seen from the statement of facts, summarized and quoted above, what the situation and circumstances surrounding the plaintiff were, from his standpoint. It was for the jury to ascertain what were the facts with respect thereto. If they found the facts to be as the plaintiff view them, the minds of reasonable men might differ as to whether a reasonably prudent man would have acted as he did in such situation and under such circumstances. This was, therefore, a question for the jury, and we cannot say that the plaintiff was guilty of contributory negligence *per se.*

We are, therefore, of opinion that the judgment complained of, sustaining the demurrer to evidence and refusing to enter judgment for the plaintiff, was erroneous and must be reversed; and this court will enter such order as the court below should have entered.

*Reversed.*